OPINION OF THE COURT
Bernard J. Fried, J.
Defendant, Nathaniel T. Grady, following a jury verdict finding him guilty of 19 counts of various sex offenses,[1] at a day care center situated in a church, where he was the minister, moves to set aside the verdict (CPL 330.30) and renews his motion for a trial order of dismissal, on which decision has been reserved (CPL 290.10). Defendant’s main contention is that the in-court identifications were unreliable, and resulted in the conviction of an innocent person.
Mindful that a mistaken identification " 'probably accounts for more miscarriages of justice than any other single factor— perhaps it is responsible for more such errors than all other factors combined’ ” (United States v Wade, 388 US 218, 229 [1967]), I am satisfied, having presided over this 13-week trial, that there has not been the conviction of an innocent man as a result of a mistaken identification. Rather, when all the evidence is considered, the defendant’s guilt was established beyond a reasonable doubt.
With regard to the identifications, I was persuaded at trial, and am not persuaded otherwise now, that the testimony of each child who identified the defendant, in its entirety and without undue regard for occasional digressions and inconsistencies, was valid and reliable. While, arguably, all in-court identifications are inherently suggestive, this does not render them necessarily unreliable. What is required is that the in-court identification must be conducted in a fair manner. As will be seen, that is what was done here. Moreover, the inconsistencies and confusion complained of by defendant can be attributed to the ages of the six victims and the nature of the crimes to which they were subjected. (See, Johnson v State, 265 Ind 689, 359 NE2d 525, 532 [1977].) When this testimony is considered in the context of the "child sexual abuse syndrome”, it appears of even greater reliability.
The "child sexual abuse syndrome” should be considered *213 together with other syndromes, such as, e.g., "rape trauma syndrome”,[3] "battered child syndrome”,[4] and "battered wife syndrome”,[5] that explain the behavior of a crime victim, which does not appear ordinary or normative. Expert evidence concerning these syndromes, which are analogous to the "child sexual abuse syndrome”, generally has been admitted as reliable and helpful to the fact finder.[6] Such evidence, of course, "is not expert psychological testimony about the victim’s credibility, though it, like any other evidence, may affect the jury’s assessment of her credibility.”[7] For example, expert testimony describing the victim’s psychological response to rape has been allowed to include evidence pertaining to the personality changes that the victim has undergone,[8] which is deemed relevant, as explained by the syndrome, on the issue of consent. (E.g., People v Reid, 123 Misc 2d 1084 [Sup Ct, Kings County 1984].)
The "child sexual abuse syndrome” is likewise particularly helpful in explaining the reaction of a young victim when subjected to various forms of sexual abuse (cf. People v Benjamin R., 103 AD2d 663, 669 [4th Dept 1984]). The evidence is not admissible to bolster the testimony of the young victim,[9] but rather to understand the psychological aftermath occasioned by the trauma, such as false recantations and feelings of guilt and apprehension about the trial. (People v Reid, supra, at p 1085 [rape trauma syndrome — 11-year-old child].) Evidence as to this syndrome which was received during the trial was also especially helpful in allowing the jury to assess and evaluate the in-court identifications that were made by the various children.[10]
*214 Ms. Eileen Treacy, a psychologist, who has specialized in child sexual abuse, was called by the prosecutor and testified concerning the "child sexual abuse syndrome”.[11] According to Ms. Treacy, the "syndrome” has five distinct phases that are associated with it, as well as symptoms or behavioral manifestations and coping mechanisms that have been observed in sexually abused children.
The first phase, the "engagement phase”, is when the offender seeks out friendly contact with the child, which can include various kinds of "affectional behavior” such as allowing the child to sit in the offender’s lap. It is during the second phase, the "sexual interaction phase”, that the sexual abuse actually occurs. This "sexual interaction phase”, often overlaps in part, the third, or "secrecy” phase, in which the offender seeks to prevent the child from disclosing the sexual abuse. During this phase the level of threats against the child begins to increase. Such threats may include direct threats against a member of the child’s family, or a threat that the child will get in "trouble”, or actual violence directed against the child. Following the "secrecy” phase is the "disclosure” phase. It is characterized either as "purposeful disclosure”, which is relatively rare and which occurs when the child intentionally relates the sexual offense to someone else, or "accidental disclosure” which usually occurs when someone notices a change in the child’s behavior, leading to questions which prompt the child to disclose the sexual offense. Apparently, "accidental disclosure” is the most common revelation of child sexual abuse.
Finally, after disclosure, the child enters the "suppression” phase. It is at this time that the psychological defenses become operative. In this regard, as Ms. Treacy testified in explaining that children often suppress information about sexual abuse: "one needs to understand that once a child sex abuse case is disclosed, all of a sudden, all kinds of adults are marching into the life of a child. You have the police, you have the District Attorney, you have Family Court personnel, *215 you have family members who are very upset, you have school people, you have a whole bunch of folks now asking this youngster what happened * * * Families are usually under a great deal of strife when this secret has been broken, so that in a suppression phase, very often you will see a child holding back, the child will decide I am not going to talk about this, this is too much pressure * * * or you sometimes get recantation * * * Sometimes that is an intellectual strategy on the part of the child, to send all these people away * * * it is too much stress for them to have to deal with all of these people now in their lives.” This phase is often characterized by denial, or in other words, "suppression basically means shutting down, trying to keep things back”. Sexually abused children also undergo a wide variety of symptoms: regressive behavior; bed wetting; bowel movements in their pants, although previously toilet trained; regression to infantile separation anxieties; a new inability to cope with previously achieved self-help skills, with the result that the child requires the mother’s help again. These children also begin displaying other previously unexperienced behavior: temper tantrums beyond what had been normal; hyperactivity or withdrawal; exaggerated fear levels, such as fear of men or fear of locations where the sexual offense took place; inappropriate sexual play with peers, toys, or dolls, including touching themselves or other children in an inappropriate manner; sexually oriented conversation; detailed, and inappropriate— for their age — sexual knowledge; eating disorders; sleeping disorders, or a fear of sleeping alone; nightmares; flashbacks, crying spells, resulting from lowered frustration thresholds. Furthermore, since a child of young age is unlikely to possess detailed sexual knowledge, his or her description of sexual intercourse, or oral or anal sodomy, is usually evidence that the child had, somehow, viewed explicit sexual activity or materials, or, more likely, was sexually abused.
Dr. Heacock, the defense child psychiatrist, agreed that children who have been sexually abused will tend to deny the abuse, although the child would be more likely to discuss abuse which has occurred outside the family. He pointed out that the abused child "will tend to deny that this occurred and this is * * * a normal protective defensive reaction”. Dr. Heacock acknowledged, in response to a hypothetical question, that when called to the witness stand in the courtroom, the conduct of a child in initially denying that a defendant, also present in the courtroom, was the molester, could be consis *216 tent with the syndrome. It was his opinion that the children could deny both the sexual abuse as well as the identity of the abuser. This opinion reinforced the testimony by Ms. Treacy that a child’s first reaction on confronting his or her molester, in court, may very well be denial or evasion. Dr. Heacock also agreed, with respect to the child sexual abuse, that "false denials are common but that false disclosures are rare”.
With this discussion of the "child sexual abuse syndrome”, which explains the psychological context and setting in which the in-court identifications were made, I now turn to the testimony of the children, themselves, together with other relevant evidence. In considering the testimony of the children, it is useful to keep in mind the statement of Dr. Jon. L. Regier, executive director, New York State Council of Churches, Inc., that, in court proceedings, the "child becomes confused and/or intimidated and their witness is less than accurate and, at other times, completely blocked”.[12]
HAROLD o.:
The first child called to testify was Harold O., who was approximately four years old when he was sexually molested and five years, nine months old at the time of trial. Following an extensive voir dire, Harold was permitted to give sworn testimony. Acknowledging that his father was present in the courtroom, Harold, using anatomically correct dolls, testified that he had been sodomized while attending class. The assaults had occurred during naptime, when a man Harold called "Ingle” came into the class and took Harold into the bathroom, located inside the classroom, where the acts charged were committed. "Ingle” wore a black suit, black shoes and a white shirt and tie; he was bald-headed, with hair on the sides of his head. Harold also saw this man take four other children — Emmanuel L., Marc G., James J. and Tiffanie B. — into the bathroom during naptime but could not see what happened to them. Harold was then told to stand up and to "look around the courtroom” and asked if he saw "Ingle”, to which he replied "no”.
Thereafter, out of the hearing of the jury, the prosecutor stated he had seen Harold avoid looking at defendant and requested that Harold be permitted to leave the witness stand and walk through the well of the courtroom, accompanied by *217 his father or a court officer. Over defendant’s objection the request was granted and Harold was allowed to walk around the courtroom. However, he did not see "Ingle”. Harold continued his testimony and said he had been afraid of "Ingle” when taken to the bathroom, that it still bothers him, and that he still thinks about how scared he was. He also testified that he does not want to talk or think about "Ingle”; that thinking about "Ingle” makes him sad; that he does not want to talk about him; and that he would like to forget about "Ingle” and what he did to Harold. It hurt him to talk about "Ingle” in court, and he wanted to make the picture in his mind of "Ingle” go away. Cross-examination was waived and Harold was excused.
Seven days later, after extensive argument, Harold was recalled, over defendant’s objection. During the argument on the motion to recall it was disclosed that Harold had stated to his mother that he had seen "the man” in court. Harold said that he saw "Ingle” "out of the corner of my eye” and that "he didn’t look at him except out of the side of his eye because he pretended he was somebody else”. "[H]e walked * * * past the man two times but he didn’t look at him.” "[H]e was scared because, when the crime had occurred, 'Ingle’ had told him he would hit him with a bat”. Having observed Harold’s demeanor during his testimony, it was my view at the time that circumstances warranted exercising my discretion, and allowing the People to recall Harold.
Harold was recalled, and he was asked whether, besides his father, he had seen someone whom he knew in the courtroom when he had been previously in court. He replied that he had seen "Ingle”. When asked why he did not so testify the other day, his answer was: "because I was scared”. When asked of what he was scared, Harold paused, looked to his right, looked straight down, and then looked behind the Bench. Asked again, Harold responded that he was scared of "Ingle”. Harold was asked whether he had looked at "Ingle” when he was in court before, and he said that he had "by the side of my eye”, and that he had pretended "Ingle” was not there.
After being assured that a court officer was behind him, Harold was asked to stand up and see if he saw "Ingle”. Although he did not answer initially, Harold answered "yes”, but when asked again, said "no”. When asked where he had seen "Ingle” in court on the previous occasion, Harold first pointed at the defense table, then, accompanied by a court officer, he got off the stand and pointed to the floor in front of *218 the Bench. He then said that "Ingle” had been sitting alone. During his testimony, Harold had "stiffened”, and looked to be in a "very pained, strained fashion”.
Direct examination then continued and Harold acknowledged that earlier, during his second court appearance, he had been looking very hard at the table in the courtroom "to see if 'Ingle’ is there”. Harold stated that on the previous appearance, "Ingle”, whom he fully described, had been seated alone at the table. He then said that "him [the defendant] over there looks like 'Ingle’ ”. Over defense objection, the defendant was directed to stand and Harold identified the defendant as "Ingle”.
On cross-examination, Harold was shown two photographs (defense exhibits),[16] and stated that they were not photographs of "Ingle”.
Having observed the entire testimony of Harold, I was satisfied that he, in fact, saw the defendant in court the first time, recognized the defendant as "Ingle”, his molester, but that he was afraid to identify him. His strategy was to look at "Ingle” only "by the side of’ his eye, and to pretend that Ingle was not there. When Harold identified the defendant his identification was not the result of an unduly suggestive procedure. Indeed, I was certain that it was a correct identification: notwithstanding initial fearful reluctance and inconsistencies, Harold described the defendant as looking and dressing the same as the person he had recognized in court on the earlier appearance, and positively identified him as "Ingle”. As Ms. Treacy (the psychologist) testified, his response in court, on the first occasion, and his subsequent explanation that he had "pretended” not to see the defendant and looked at him out of the "corner of his eye”, are understandable as associated with the "suppression” phase of the syndrome.[18] *219 Hence, there was, as indicated, a valid basis for exercising my discretion in allowing Harold to be recalled to the stand and to permit him to identify the defendant.
TIFFANIE B.:
After Harold’s first court appearance, and before he was recalled, another child victim, Tiffanie B., was called and sworn as a witness. Aged approximately five years, five months at the time of trial, Tiffanie described incidents that occurred when she was about three years, nine months old. This witness, too, did not identify the defendant when she first testified, but did so when she was recalled over defense objections, the next day.
When she first testified, using the dolls, she said that the man who did "bad things” to her at the day care center was "Jason’s father”; however, the man was not in court. When asked whether she looked at everyone, and whether she was sure, she responded "yes”. Tiffanie was allowed to step off the witness stand, and when asked whether she saw her assailant, shook her head indicating "no”.
After an extended sidebar, Tiffanie was escorted around the courtroom. Tiffanie was instructed to look at every person and "tell us here whether you see the man who did the bad things to you at the day care center”. She again answered "no”. Testimony concerning the rape and sodomy followed, which Tiffanie said took place during naptime, in the bathroom, which was located in her classroom. Tiffanie had also seen him take other children, including Harold, James, and Marc, to the bathroom and sexually assault them. She did not see anyone in court who looked like "the man [who] did these things”.
The following day, the prosecutor moved to recall Tiffanie, alleging that, after court the previous day, Tiffanie said that she recognized her assailant, whom she knew as "Jason’s father”, in court, but did not say anything because she was afraid; in the telling, she started to cry.
Thereafter, over objection, Tiffanie was permitted to be recalled and when she returned she was examined concerning the previous day’s testimony. At first, she denied that she had recognized anybody in court from the day care center. How *220 ever, she then testified that she had seen somebody, although, at first, denied that she knew the person. She then replied "that he is in court * * * the man * * * Jason’s father”. She said that she had seen him in court "yesterday”, but did not say so because she was "afraid * * * that I would get in trouble * * * with the judge”. Tiffanie was asked where "the man” was and she pointed to her right, in the direction of the defense table. She stated that he was "the one in the middle” at the defense table. On cross-examination, Tiffanie viewed defense exhibits, and identified them as "Jason’s father”, who she testified was the man who did the "bad things” to her.
I was satisfied that there was sufficient basis to exercise my discretion and allow Tiffanie to be recalled. I was convinced that Tiffanie, in fact, had seen defendant in court on her first appearance, recognized him as the molester, but that she was driven by fear to make a nonidentification. When Tiffanie did identify defendant on her second appearance, her identification was not the result of an unduly suggestive procedure; it was a reliable and clearly correct identification. She had initially described "the man” who assaulted her as having an office "almost next door” to the classroom. This could be no one other than the defendant. She also recognized her molester as the man who dressed up as Santa Claus, that "the man” had a beard but was bald, and wore a suit and tie. The fact that she was afraid of defendant, who was looking at her, as well as afraid of myself, when first asked for an identification, accounts for and explains her initial failure to make an identification.
According to Ms. Treacy, Tiffanie’s behavioral changes were consistent with the child sexual abuse syndrome.[21] Thus, it is reasonable to view Tiffanie’s in-court behavior, on the first occasion, and her explanation for not identifying her molester, as consistent with the syndrome. Considering her testimony, I *221 am satisfied that I did not abuse my discretion in allowing Tiffanie to be recalled to the stand to identify the defendant. Moreover, as stated, I am also satisfied that her identification of defendant was reliable and accurate.
james j.:
James J. was almost three years while attending the day care center and approximately four years, seven months old when he testified as an unsworn witness. He was called following Tiffanie, but prior to the recall of Harold, and testified that, while attending the day care center, he had been sexually molested in the bathroom, within the classroom, by a man whom he called "The Reverend”. When asked whether he recognized that person in the courtroom, James pointed to a white man seated in the courtroom with a full head of hair. After a short recess, he pointed to a different man, this time a black man, wearing glasses. At this point, an application to continue James’ examination on live, two-way closed circuit television was made and granted pursuant to CPL article 65.
The televised testimony commenced the following day and James, again, testified that the man who hurt him at the day care center was "the Reverend”, whom he also called "the muppet man”, since he had put on a show for the children. James did not remember what the man looked like. He did, however, recall pointing out a person in the courtroom the previous day, but he did not know who the person was nor why he pointed him out. Using the dolls, James then proceeded to describe the sexual abuse. The video camera, located in the courtroom, panned the entire courtroom, stopping momentarily on the face of each person therein, including the defendant. This was observed by James on a monitor located in the testimonial room; however, he did not identify the defendant, or anyone else, as associated with the day care center. (A videotape, which showed exactly what James had seen as the camera panned the courtroom, was shown to the jury.)
Although James failed to make an in-court identification, and indeed made two misidentifications, he identified the person who abused him as "the Reverend”. I am satisfied that this testimony, together with the direct evidence of the other children that they had seen the defendant sexually abusing James in the bathroom, lessens the significance of James’ failure to identify the defendant in court. Furthermore, the *222 testimony of his mother, concerning behavioral aberrations that began occurring at the end of February 1984, was consistent with the syndrome.[23] Accordingly, there was ample evidence, direct and indirect, to establish a reliable and accurate identification of the defendant as the person who had abused James.
EMMANUEL L.:
Emmanuel L., who was almost 5Vi years old at the time of trial, and approximately three years, 10 months when at the day care center testified (under oath) that he had been sexually abused by a man whom he called the "robber”, a man he described as bald, with a moustache and beard, who wore a black suit, a white shirt and a tie, and black shoes. He did not see the man in the courtroom and, at this point, the defendant was directed, over objection, to stand. Emmanuel was asked whether the defendant’s hair looked like that of "the robber”. At first, he said he was unable to see, because the sun was in his eyes. When the shades were drawn, Emmanuel testified that defendant’s hair was different from "the robber’s”. Again, Emmanuel did not identify the defendant.
Thereafter, using the dolls, Emmanuel began describing the sexual abuse to which he was subjected; however, observing that he had started to pinch and scratch at himself, a recess was taken. When the testimony resumed, Emmanuel stated that the man, whom he called the "robber” did the "bad” things when he came into the classroom at rest time; but when he came in at other times, he acted "good”.
After describing how "the robber” hurt him, Emmanuel testified that he does not like to think of it, does not like to talk about it, and wants "the robber” arrested. Emmanuel’s gaze wandered and, when questioned, he said he was "looking over there to see if, well, to see if I see the guy.” When asked where he was looking (he indicated the clerk’s desk on the far right side of the courtroom, which was located past the defense table), he said that he wanted "to see * * * around the room very closely”. Emmanuel then stated that "I saw around the room”, and shifting his gaze, said that he was looking "right up to the chandelier”; then "well, after I looked at the chandelier, I looked at the table [defense table]”. *223 Emmanuel said that he looked there "cause I just wanted to see what the, the edge, the foot of the table looked like. That’s all. I just wanted to see that.”
Although he did not identify defendant in the courtroom as "the robber”, I was at this point persuaded, and have not been dissuaded subsequently that the failure to do so, at this point, was caused by psychological factors which prevented him from coming to terms with defendant’s presence in the courtroom, rather than a positive assertion that the defendant was not the man who had abused him. It was evident that he was inhibited from making an express identification.
The questioning continued. After Emmanuel said that he had just looked at the "edge of the table”, he was told to view the defense table and asked whether he saw "the man who acted nice to you at this table?” Emmanuel replied "I think that was him * * * the guy with the glasses on” (indicating defendant). Emmanuel then walked to the defense table, and the following occurred:
"Q. Now would you look at him closely? [Short pause.]
"A. I think it’s him * * * I think I’m sure.
"Q. Well, would you look again so we know?
"A. Yeah.
"Q. Yeah, what?
"A. I’m sure.”
Returning to the witness stand, the examination continued:
"Q. Well, Manny, we want you to think. We don’t want you to guess or anything. We want you to think hard so you know. Take your time and look at him. [Short pause.]
"A. That’s him I think. I think so.
"Q. What?
"A. I think that’s him.
"Q. Well, would you take your time again? Look at him. Take as much time as you need to be sure. [Short pause.]
"A. Yeah. I’m sure. I’m very sure. I’m really sure.
"Q. Is he the same man that didn’t act nice to you during that time?
"A. I think so.
"Q. Well, would you take your time again to be sure? [Short pause.]
"A. I think I’m sure.”
It seems obvious that it was proper to allow Emmanuel to testify as to identification. It also appears that Emmanuel’s *224 behavior at home, to which his mother testified,[28] was associated with the "secrecy” phase of the syndrome and that his initial negative responses in court, together with his subsequent confusion and inconsistencies, relate to the "suppression” phase of the syndrome.
I am satisfied that Emmanuel’s identification was reliable and accurate, and was not the product of improper courtroom procedure.
marc G.:
Marc G., who was almost 5Vz years old at the time of trial, and three years, nine months old at the time of the molestation, was called as a witness but was not permitted to give sworn testimony.
He described his sexual molestation, which occurred during naptime in the bathroom located inside his classroom. The man who assaulted him was bald, with hair on the sides, extending below the crown in the back. He wore "light glasses”, had facial hair only on the upper lip, wore black pants, black shoes, a blue jacket (although he also testified that pants and jacket were the same color) and a tie.
Using dolls, Marc described what the man, whom he referred to as "Jason’s daddy”, did to him, and the manner in which he saw the man sexually molest Tiffanie. Marc also observed the man take Harold, Emmanuel and James into the bathroom, where each was sexually abused. Marc was asked who "Jason’s daddy was”, and he replied "Grady”.
Thereafter Marc did not identify anyone as the man who had molested him and the other children, although he was directed to look carefully at all the people in the courtroom. Immediately following this nonidentification, the prosecution sought but was denied permission to have Marc point to each person in the courtroom in an attempt to make an identification. Marc again testified that no one in court looked like "Jason’s daddy”.
*225 While Marc failed to identify the defendant, there was legally sufficient evidence to submit the counts involving him to the jury. Marc’s testimony was corroborated by the testimony of other children, who provided ample direct evidence identifying the defendant as having sexually molested Marc. Moreover, his behavioral changes were consistent with the syndrome.[30] Based on all the evidence, the jury was free to conclude that the defendant was his molester.
The testimony of the children, notwithstanding inconsistencies, misidentifications and recantations, is remarkable for its definite points of correspondence. When the details describing the molester, testified to by the children, are considered together with associations that they attach to his identity, not only a physical description, but also a portrait of the molester emerges. He is a man who is bald, with a fringe around the crown, with facial hair. The molester wore a dark suit, probably black, white shirt, tie, black shoes, and sometimes wore glasses. Emmanuel knew him as "the robber” when the man was bad, but also as the man who took Emmanuel, when he was crying on his first day of school, on his lap to comfort him. Emmanuel’s mother, as corroborated by a teacher, recalled that on Emmanuel’s first day of school when he was crying, the defendant, wearing a dark suit, black shoes, tie and a light shirt, took him on his lap to comfort him. Tiffanie recalled that the man was not a teacher, but had an office which was "almost next door” to the classroom (this is where the defendant’s office was located during the period of the sexual abuse). He was not only "the muppet man”, whom James remembers put on a show for the children but also dressed up as "Santa Claus” at Christmas. Moreover, the molester is the man who was known by James as "The Reverend”, and by Marc as "Grady”.
This testimony establishes that the molester was a person who looked and dressed like defendant; who engaged in the same activities with the children as defendant; who had an *226 office in the same general location as defendant; and who was remembered by the same name and title as defendant. The evidence also describes a man who undertook the same roles and responsibilities towards the children as described in defendant’s own testimony.
The defendant testified that he did interact with the children on occasion and that the children had the opportunity to familiarize themselves with him. Moreover, while he testified he had no participation in the operation of the day care center except as it related to his being a member of the board of directors, he also testified that, as the (church’s) on-site representative, he was responsible for repairs and maintenance. Indeed, during the spring of 1984, he was involved in overseeing maintenance activities at the center, which included painting and refurbishing the classroom involved here. While work involved was done by volunteers on weekends or at night, he would enter the classrooms, during the daytime, on a regular basis, to check on the work’s progress. Moreover, if he was in the building, he would occasionally go into the classrooms to say "hello” to the children.
Although defendant testified that he was never in a classroom while it was unattended, Ms. Lorenz (the class teacher) testified that during the spring of 1984, she once entered her class to find defendant leading a child from the bathroom to a cot; defendant explained that the children had to go to the bathroom. As the defendant left, Ms. Lorenz looked in the bathroom and saw Tiffanie with her pants down together with two boys.
Thus, defendant’s own testimony corroborates that the children had ample opportunity to know him: he was regularly on the premises while the children were present, and he interacted with them as a person associated with their day care center. In this regard, he played a guardian’s role and undertook, on at least one occasion, to calm an upset child. His behavior towards the children was bond-forming, however sporadic, almost as a caretaker, establishing a position not only of familiarity, and authority, but also of trust. His role or place, in the eyes of the children witnesses, sheds yet more light on the in-court identifications, especially in light of the "syndrome” evidence. (See, Roe, Expert Testimony in Child Sexual Abuse Cases, 40 U Miami L Rev 97, 106-108 [1985].)
It is now appropriate to address the main claim of error, in which the defendant argues that the in-court identification of *227 him by four of the children was the product of impermissibly suggestive courtroom procedures resulting in irreparably tainted identifications. Contributing to this, so the argument runs, was the denial of his request, made prior to the trial, that there be ordered either an in-court corporeal lineup, which would include Josué V. ("Jason’s father”), or other alternative in-court arrangements, also to include Josué V. The permission granted to recall Harold O., Tiffanie B., and Emmanuel L. to make their respective in-court identifications is argued also to have contributed to the allegedly mistaken identification.
Turning first to the request for an in-court lineup or to vary the traditional courtroom seating arrangements, it is undisputed that there is no constitutional requirement that a defense requested in-court lineup be conducted. Rather, it is acknowledged that such a request is addressed to the sound discretion of the court. (See, e.g., United States v Archibald, 734 F2d 938 [2d Cir 1984], mod on petition for reh denied 756 F2d 223 [1984]; United States v Brown, 699 F2d 585 [2d Cir 1983]; United States v Williams, 436 F2d 1166 [9th Cir 1970]; see also, People v Powell, 105 AD2d 712 [2d Dept 1984, Titone, J., dissenting, collecting cases, pp 714-715], affd 67 NY2d 661 [1986].) For the following reasons I found that the circumstances of this case did not warrant the exercise of discretion to order the relief sought. First, as the District Attorney pointed out, and as was evident, there was prior familiarity between the defendant and each of the children. The defendant was the minister at the day care center and occupied an office next door to the classroom where the sexual abuse had allegedly taken place. He had conceded, in earlier court papers, that he had been there on a "daily basis” and that he was not a "stranger” to the children attending the center. Thus, there was no reason to hold an in-court lineup since it was expected that the children knew the defendant, Reverend Grady, from their day care center.
Second, all the requested special procedures involved ordering the participation of Josue V. ("Jason’s father”). However, there is no authority to compel a third party to participate in an in-court lineup or to sit in the courtroom during the trial. Although there is some authority to introduce a person as an exhibit (People v Diaz, 111 Misc 2d 1083 [Sup Ct, NY County 1981]), no such relief was sought.
Additionally, it is significant that the potential identifying eyewitnesses were very young children, who, it is well known, *228 suffer extreme difficulties in a courtroom setting. (See generally, Berliner, The Child Witness: The Progress and Emerging Limitations, 40 U Miami L Rev 167 [1985]; see also, Goodman, The Child Witness, J Social Issues, vol 40 [1984].) It is not surprising that "[testifying in a courtroom is likely to be stressful for any witness, but there are several reasons to predict greater stress for children. The situation will be more novel and less predictable for the child than for adults; the sight of the defendant may be particularly disturbing because the child might believe that the defendant will retaliate against the child in the courtroom; or the child may think that he or she, rather than the defendant, will be sent to jail or taken from home” (Goodman and Helgeson, Child Sexual Assault: Children’s Memory and the Law, 40 U Miami L Rev 181 [1985]; see also, Judiciary Law § 211 [j], [k] [L 1985, ch 505] [requiring the Chief Judge of the Court of Appeals to develop "education and training of judges * * * concerning the social and psychological stages of child development to ensure that they adopt or modify, where appropriate, courtroom procedures, including the questioning and treatment of a child witness by the parties, to protect the child from emotional or psychological harm”]). Thus, unless the circumstances warranted, and here they did not, there was no reason to add to the expected stress that the children would encounter when they testified.
At the time of the pretrial request for an in-court lineup or other arrangements, all to involve Josué V., I was aware that early in the investigation two of the children, Tiffanie B. and Marc G., when asked who had molested them replied that it was "Jason’s father”, but that they had not been shown photographs of Josué V. ("Jason’s father”). That two of the children during the investigation had referred to "Jason’s father” did not require that an in-court lineup be ordered. The children had not misidentified "Jason’s father”, by a photograph, but had simply called the defendant, whose photograph they had identified, by this name. At trial, all the pretrial events involving the children’s use of the phrase "Jason’s father” were brought out through the testimony of the children themselves as well as various law enforcement personnel who were involved in the investigation and pretrial prosecutive stages of this case. Thus, the jury was fully aware of all the circumstances involving the various references to "Jason’s father”.
Under all the circumstances, it was my opinion that to *229 order an in-court lineup or other arrangements would have been unnecessary and inappropriate. Finally, that the request was renewed before each child testified at the trial did not require that I change my initial decision. Each child was independent from each other and the fact that a child, who had testified earlier, had difficulty in making an in-court identification, did not establish that the procedures used were unduly suggestive. Thus, I adhered to the original decision throughout the trial.
Defendant also contends that it was error to permit Harold O. to be recalled six days later; Emmanuel L. to be recalled after a luncheon recess; and Tiffanie B. to be recalled the following day. As discussed above, each recall was factually warranted under all the circumstances. That one or another particular period of time elapsed does not invalidate the procedure, especially when, as here, the failure to make an initial in-court corporeal identification was explained. (Cf. United States v Kaylor, 491 F2d 1127, 1130-1131 [2d Cir 1973].) Moreover, the jury saw, first hand, the manner in which the in-court identifications were made, the continued difficulties experienced by the children, and they were able to assess the accuracy of each identification. Furthermore, the fact that each child was extensively cross-examined following recall provided further opportunity for the jury to determine whether the in-court identifications were reliable and whether, and to what extent, there was a "potential for error” (Simmons v United States, 390 US 377, 383 [1968]). Finally, the jury was entitled to find that inconsistencies and confusion in their testimony was attributable to their ages, "their inexperience in the courtroom and lack of familiarity with police investigative practices, and the shocking nature of the crime to which they were witnesses.” (Johnson v State, 265 Ind 689, 699, 359 NE2d 525, 532 [1977], supra.)
In sum, I am satisfied that the in-court identifications of the defendant were not the inexorable result of impermissibly suggestive courtroom procedures.
With regard to all the children, I conducted an inquiry into whether each child was competent to be sworn in accordance with CPL 60.20. Four of the six were deemed capable of understanding the nature, obligation and consequence of an oath, even though their ages ranged from five years, five months to five years, nine months old. (See, Wheeler v United States, 159 US 523 [1895] [5 1/2-year-old child]; see also, People v Clash, 114 AD2d 1052 [1st Dept, Nov. 21, 1985, affg lower *230 court without opn] lv denied 67 NY2d 650 [1986] [six-year-old child].) For convenience, attached as an appendix to this opinion are my stated reasons, following an extensive voir dire of each child permitting them to testify as sworn witnesses.
Accordingly, for the reasons stated above, both the motion for a trial order of dismissal and to set aside the jury’s verdict are denied.

. The victims were five young children, four boys and a girl. Defendant was acquitted of two other charges involving a sixth child, a boy.

. People v Reid, 123 Misc 2d 1084, 1085 (Sup Ct, Kings County 1984).

. People v Henson, 33 NY2d 63 (1973).

. People v Emick, 103 AD2d 643 (4th Dept 1984); People v Torres, 128 Misc 2d 129 (1985) (technically a "defense”).

. See generally, Massaro, Experts, Psychology, Credibility and Rape: The Rape Trauma Syndrome Issue and its Implications for Expert Psychological Testimony, 69 Minn L R 395.

. Id, at 459-460.

. See, State v Thomas, 130 Ariz 432, 434, 636 P2d 1214, 1216 (Sup Ct 1981); but see, State v Saldana, 324 NW2d 227 (Minn Sup Ct 1982) (would have allowed rape trauma syndrome for child victim); State v McGee, 324 NW 232 (Minn Sup Ct 1982).

. But see, State v Kim, 64 Hawaii 598, 645 P2d 1330 (1982); State v Middleton, 294 Or 427, 657 P2d 1215; State v Harwood, 45 Or App 931, 609 P2d 1312 (1980). (All holding such testimony admissible to bolster the victims’ credibility.) See also, Massaro, op. cit., at p 467.

. See generally, Terr, Child Psychiatry and the Law: The Child as *214 Witness (1980), at 212-215. (Discussion of defense mechanisms that arise causing abused children to identify with the molester, leading to intense loyalty conflicts.)

. Dr. Don Heacock, a child psychiatrist called by the defense, testified that the "child sexual abuse syndrome” is not recognized in terms of the diagnostic manual (DSM III). However, it is a syndrome with which he was familiar and which he stated primarily concerned child sexual abuse occurring inside the home.

. See, bill jacket to Laws of 1985 (ch 505) adding CPL article 65, authorizing "Closed-Circuit Television for Child Witnesses”, letter dated July 3,1985.

. Defendant’s exhibits were not photographs of defendant: they were black and white photos of Josué V., who resembles defendant. Josué V., who is the father of Jason, another child who was in Harold’s class was called as a prosecution witness.

. Factors establishing that Harold suffered from the syndrome, include the following behavioral changes, to which his mother testified: fear, anger, and sadness; crying alone in his room; acting aggressively; breaking crayons and scribbling; throwing plants; breaking things; and acting in a sadistic manner towards a baby brother. Such otherwise unprecedented behavior all occurred in the morning, before he was to go to school. His mother recalled, in particular, that on February 17, 1984, when she picked Harold up at school, he had trouble walking and complained of constipation. The next *219 day, he would not eat, became quiet, would cry, and constantly go to the bathroom. That afternoon she saw mucous, feces, and blood on Harold’s underwear, and rushed him to the hospital.

. The testimony of Tiffanie’s mother is relevant: Tiffanie underwent pronounced and unprecedented behavioral changes in February or March 1984; she had nightmares; at night, she would see a man in the window who she said was coming to get her; she would wet the bed; she started using the word "secret”, which she had never used before; she began sexually inappropriate behavior with her brother by laying on him and rubbing against him. Also, around February 1984, Tiffanie started becoming agitated and aggressive; she began to fight and to act babyish. By March, Tiffanie was reluctant to go to school. Tiffanie seemed to need more overt affection. On cross-examination, she testified that when Tiffanie was finally taken out of school at the day care center, on or about April 30, 1984, she reverted back to normal behavior.

. James’ mother testified that James began to wet the bed, regressed to babyish habits, required his mother to feed him, and wanted his mother to sleep with him. As with the other children, this behavior was a new development for James.

. Emmanuel’s mother testified that Emmanuel had undergone pronounced personality changes on March 18, 1984. Emmanuel did not want to go to school; would cry; and would fight with his parents. After April 18, 1984, Emmanuel began to wet his bed at night, would occasionally wake up, and stare at the darkness; would occasionally beat on his parents and would awake "sweaty” from nightmares during his afternoon nap. Emmanuel also lost weight; developed an uncontrollable temper; withdrew from activities that he previously had liked; talked about strange secrets; assumed girlish positions; assumed positions with his anus up in the air; and Emmanuel complained of constipation, of which he had no prior history.

. Marc’s mother testified that she noticed changes in Marc’s behavior about March and April 1984, in that when he came home from the center, he would run to his room, and sleep from 6:00 p.m. until midnight. He also began wetting the bed; rejecting his mother; refusing to eat; making bowel movements in his pants, although he had been toilet trained; and expressing insecurity about her love. He also stopped sleeping in his room; he became afraid of sleeping alone; became afraid of the dark; regressed to babyish behavior; and would cry, "Mommy, Mommy, the man, the man”, when he was unable to sleep.