THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN TAYLOR, Appellant.

Second Department, December 30, 1988

APPEARANCES OF COUNSEL

*Mario Malerba* of counsel *(Vincent Siccardi* with him on the brief), for appellant.

*Patrick Henry, District Attorney (Mark D. Cohen* of counsel), for respondent.

## OPINION OF THE COURT

BALLETTA, J.

■ During the summer of 1984 a young woman, 19 years of age, was subjected to an evening of sodomy and attempted rape by an individual whom she knew from the neighborhood, and whom she later, although not immediately, identified as the defendant. At trial, the court permitted the prosecution to present expert testimony on the psychological phenomenon known as "rape trauma syndrome" as an explanation for the victim's failure to immediately identify her assailant. The defendant contends that this was error. We disagree.

In this case of apparent first impression, we hold that testimony with respect to the psychological phenomenon of rape trauma syndrome by a properly qualified expert is admissible in a rape case even where the victim is not a minor and the defense is not one of consent. Under the circumstances of this case, such evidence was relevant, a proper subject of expert opinion and not unduly prejudicial, and did not constitute an improper bolstering of the victim's credibility.

At approximately 9:00 P.M. on the evening of July 29, 1984, the victim, a 19-year-old resident of Southold, New York, received two telephone calls from a man claiming to be a friend of hers by the name of Paul. The caller told her that he was very upset and that he needed to talk to her, but that he couldn't speak to her over the telephone. The victim borrowed her mother's car and proceeded to meet him at a nearby location. A few minutes after arriving at the agreed-upon spot, a young man approached her parked vehicle. Believing that this man was her friend Paul, she released the locks and allowed him to enter the car. She immediately realized that the man was not her friend, but rather the defendant, a young man she had known from the neighborhood for years and whom she had seen the previous night. She told him that she knew that he was "John", whereupon the defendant ordered her at gun point to drive to Clark's Beach, a secluded location, where, at gun point, he sodomized her twice and attempted to rape her. This sexual assault continued for about 45 minutes, after which the defendant forced her to drive him back to the spot where he had entered her vehicle.

The victim immediately returned home between 11:00 and

11:30 P.M., woke her mother up and told her that she had been sexually attacked and that she was scared she was going to be killed. The victim's mother telephoned the police who arrived 10 minutes later. While waiting for the police to arrive, the victim, who was hysterical and sobbing, washed her face and drank some soda. Her hair was matted, her sweater on inside out, and she appeared to be very upset. Nevertheless, she gave a description of her assailant to the two police officers, speaking rapidly and jumping up and down as she did so.

Officer Baglivi drove the victim and her mother to the Southold Police Station, tape recording their conversation as they proceeded. The victim advised him of the two telephone calls she had received earlier that evening while they drove around and attempted to retrace the route taken to Clark's Beach with the defendant, the officer jotting down license plate numbers as he drove along.

The victim was interviewed at the police station by a Detective Burke, who advised her that he wished to tape record the interview. Her hair was still disheveled and matted; her sweater was still on inside out, and she was in a highly upset state. She proceeded to relate, outside the presence of her mother, the circumstances of the sodomies and attempted rape earlier that evening. Again, just as she had told the officers earlier at her home, the victim indicated that she did not know her attacker.

After concluding this portion of the interview, Detective Burke shut the tape recorder off and asked the victim if she would step into a private room and change her clothing in order that the clothing she wore earlier that evening could be used as evidence in the investigation. As she finished changing her clothing, her mother told her that anything further that she could tell the police might be of help, whereupon the victim turned to her mother and stated, "John Taylor [the defendant] raped me". She immediately told Detective Burke the same thing, stating that she was "sure" that the defendant was her assailant. The victim made these statements at approximately 1:15 A.M. After taking certain physical evidence, Detective Burke transported the victim, accompanied by her mother, to Eastern Long Island Hospital for a medical examination.

Upon arriving at the hospital, the victim was introduced to emergency room nurse Elizabeth Hug who observed that she

was disheveled, pale, tremulous, very hesitant in speech, soft spoken, and in a "teary state". Nurse Hug was able to calm her sufficiently so as to complete the medical examination. She was thereafter released and went home.

The defendant was arrested later that day and subsequently identified by the victim in a lineup.

The defendant's first trial resulted in a hung jury. Following that trial, he sought to remove the case to the Supreme Court on the ground of prejudice and bias, and to recuse Justice Namm. The motion was denied (126 Misc 2d 537).

Also, subsequent to that first trial, it was discovered for the first time that Officer Baglivi had tape recorded his conversation with the victim en route to the police station on the evening of July 29, 1984, but that the tape recording had been destroyed. As a result of this revelation, the defendant moved to dismiss the indictment on the ground that *Brady* material *(see, Brady v Maryland,* 373 US 83) had been destroyed.

After a hearing, the court found that dismissal of the indictment was not warranted. Although the court found that a tape recording had indeed been made and destroyed, the court determined that it could not ascertain whether the destruction was intentional or inadvertent. The court further found that, in any event, there was no evidence to suggest that there was anything in the recording which went to the critical question of whether the victim could identify the perpetrator and thus it contained nothing that would assist the defendant in his examination of the People's witnesses. The court thereupon denied the defendant's motion to dismiss the indictment as well as the defendant's motions to disqualify the Suffolk County District Attorney and to appoint a Special Prosecutor.

After a second trial, the jury rendered a verdict finding the defendant guilty of sodomy in the first degree (two counts) and attempted rape in the first degree.

I

During the course of the second trial, the prosecution presented the testimony of Eileen Treacy as an expert witness with reference to the psychological phenomenon known as rape trauma syndrome. Ms. Treacy, a teacher at Herbert Lehman College of the City University of New York, had Bachelor's and Master's degrees in psychology, extensive experience in counseling sexual assault victims, and previous

experience as an expert witness in forcible rape cases. She testified that the syndrome was first described in the American Journal of Psychiatry by Drs. Burgess and Holmstrom in 1974. Since that time, a very large amount of data and research has been collected, and the syndrome is recognized as a type of posttraumatic stress disorder, which is a diagnostic category that is accepted within the professional community (for a relatively recent summary of the research on rape trauma syndrome, *see,* Donohue, *Another Door Closed: Rape Trauma Syndrome,* 23 Gonzaga L Rev 1 [1987/1988]).

Ms. Treacy explained rape trauma syndrome as a two-phase reaction that the victim undergoes after having experienced a forcible rape or attempted forcible rape. The first phase, or the acute phase, occurs immediately after the attack and may last for a few weeks thereafter. The second phase, or the reorganization phase, is that period of time during which the victim generally is recovering from the initial shock and is attempting to carry on with her normal life.

There are three patterns of behavior which are generally manifested by forcible rape victims in the acute phase following the attack. These three patterns of behavior, or reaction, are known as (1) the behavioral stage, (2) the symptomatic stage, and (3) the psychological stage. In the behavioral stage, the victim's behavior may either be "expressed"—i.e., characterized by hysteria, crying, shaking and weeping,—or "controlled"—i.e., characterized by calmness and collectedness. The symptomatic stage produces physical reactions such as great pain, burning and itching during urination. Headaches, nervous tension, tight stomach and jumpiness are also noted in this stage. Finally, the psychological stage is characterized by specific fears which are focused on the offender coming back and hurting the victim or the victim's family if the incident or offender is reported.

The expert's testimony was limited to the acute phase. She also noted that the time immediately after a person has been through a life-threatening situation may not be the best time to collect information since the victim's thinking may be disorganized and the victim's anxiety may interfere with her recall abilities.

The defendant contends that the admission into evidence of this testimony on rape trauma syndrome was improper. He argues that such testimony did no more than impermissibly bolster the victim's testimony, and that as a result, the expert

invaded the province of the jury by lending credence to the victim's testimony that she initially failed to name the defendant as her assailant due to fear. The defendant contends that to date no court in this State has permitted such testimony in a case that did not involve either a minor or the defense of consent. At bar, the victim was 19 years old at the time of the attack, and the defense was not one of consent but was one of improper identification.

The Court of Appeals summarized the pertinent principles of law regarding the admissibility of opinion evidence in *People v Cronin* (60 NY2d 430, 432-433) as follows:

"While controversy about opinion testimony going to the ultimate questions has brewed elsewhere, in this State the test has been different. For testimony regarding both the ultimate questions and those of lesser significance, admissibility turns on whether, given the nature of the subject, 'the facts cannot be stated or described to the jury in such a manner as to enable them to form an accurate judgment thereon, and no better evidence than such opinions is attainable.' *(Van Wycklen v City of Brooklyn,* 118 NY 424, 429; *Noah v Bowery Sav. Bank,* 225 NY 284, 292.)

"The admissibility and bounds of expert testimony are addressed primarily to the sound discretion of the trial court, and review beyond the intermediate appellate level is generally unwarranted. *(Selkowitz v County of Nassau,* 45 NY2d 97, *supra.)* It is for the trial court in the first instance to determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefited by the specialized knowledge of an expert witness" *(see also, People v De Sarno,* 121 AD2d 651, 654).

The admission of expert opinion testimony is proper "when it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror" *(see, De Long v County of Erie,* 60 NY2d 296, 307). A defendant is always entitled to impeach the prosecution's witness or to present experts of his own to offer a different opinion *(see, Selkowitz v County of Nassau,* 45 NY2d 97, 103). In fact, in this case, the Trial Judge explicitly advised defense counsel that he was free to cross-examine the witness or to present his own experts.

Testimony regarding rape trauma syndrome has been admitted in some courts in New York State. In the earliest

reported case, *People v Reid* (123 Misc 2d 1084, 1085-1088), Justice Douglass wrote:

"The term 'rape trauma syndrome' was first introduced into the scientific literature in 1974, in an article in the American Journal of Psychiatry entitled Rape Trauma Syndrome, by Burgess and Holmstrum, and is used to describe the rape victim's unique response to the violence of rape which is different from the response of those who experience other forms of violent attacks. Since that term first appeared, the reaction of rape victims has been the subject of numerous scientific research efforts (see, e.g., Calhoun, Victim Emotional Response: Effects on Social Reaction to Victims of Rape, 20 British Journal of Social Psychology, at p 17; Williams and Holmes, The Second Assault, at pp 82-86; Special Features: Assessment and Treatment of Rape Victims, 36 The Clinical Psychologist, 88; Ferris, Long Term Consequences of Adult Rape, Response, A Publication of the Center for Women's Policy Studies [Jan.-Feb., 1983, at pp 5-6]; also see, *State v Marks,* 231 Kan 645, citing other scientific studies).

"These studies do not suggest that all rape victims react the same way, but rather that because of the feelings of shame or guilt or fear of public embarrassment, the reaction of the rape victim is unique and different from the reaction to other forms of violent assault. Since the reaction to rape is unique and so complex as to warrant scientific investigation, it follows that an understanding of those reactions is not within the common understanding or experience of persons of ordinary intelligence and experience who may be expected to sit on a jury. That logical conclusion, that people do not understand either the cause or reaction to rape, is universally confirmed in scientific studies in this area (see, e.g., Burt, Cultural Myths and Supports for Rape, 38 Journal of Personality and Social Psychology, at pp 217, 229).

*"Since rape and the victim's reactions are not within the common knowledge of jurors, and since the subject is pervaded by myth, emotion and prejudice, virtually every reported case has approved the admission into evidence of expert testimony to describe the psychological response to rape (Division of Corrections v Wynn,* 438 So 2d 446 [Fla]; *State v Harwood,* 45 Ore App 931; *State v Kim,* 64 Hawaii 598; *State v Lebrun,* 37 Ore App 411; *State v Marks,* 231 Kan 645, *supra; State v Middleton,* 294 Ore 427; *People v Bledsoe,* 140 Cal App 3d 267). \* \* \**

*"The admission of this expert testimony is no more inflammatory, nor more intrusive into the province of the jury than other expert testimony, assuming adequate and proper instructions are provided to the jury, and, of course, the expert will not be permitted to testify as to whether she believes the witness (People v Parks, 41 NY2d 36; People v Ciaccio, 47 NY2d 431), but rather, will be permitted to explain rape trauma syndrome to the jury and express her opinion that the victim suffers from that syndrome.* The jury will then consider the credibility of the victim's testimony along with whatever other evidence is submitted on the question of credibility. And needless to say, the defendant is free to call such experts who may express a view different from the view expressed by the expert called by the People" (emphasis added).

More recently, the Appellate Division, Third Department, held that an expert's testimony that rape trauma syndrome could cause a victim to deny having been raped was properly admitted on the People's rebuttal case as being clearly relevant to the evidence the defendant had presented to establish that the victim had told others she had not been raped *(see, People v Whitehead,* 142 AD2d 745; *see also, People v Cruickshank,* 105 AD2d 325, 331-332, *affd* 67 NY2d 625).

The admission of Ms. Treacy's testimony on rape trauma syndrome in this case is consistent with the increasing tendency of the courts in this State to accept expert testimony on other forms of behavior which may not be commonly understood by the average juror. Thus, in *Matter of Nicole V.* (71 NY2d 112, 120) the Court of Appeals held that expert validation testimony may be used to corroborate a child's out-of-court statements in a child sexual abuse proceeding, noting that the "psychological and behavioral characteristics and reactions typically shared by victims of abuse in a familial setting are not generally known by the average person".

Similarly, in *People v Benjamin R.* (103 AD2d 663, 669), the Appellate Division, Fourth Department, affirmed the admission of expert testimony to explain why a child victim is often reluctant to reveal that he or she has been sexually abused, stating that "[t]he victims may suffer a wide range of emotional reactions resulting from the violence and breach of family trust. The average juror does not have a general awareness of a young victim's reaction to sodomy or sexual abuse * * *. The jury in this case was confronted with issues where [the expert's] specialized knowledge was helpful in arriving at an intelligent determination" *(see also, People v*

*Keindl,* 68 NY2d 410; *Matter of Ryan D.,* 125 AD2d 160; *People v Grady,* 133 Misc 2d 211, *affd* 125 AD2d 1011; *Matter of E. M.,* 137 Misc 2d 197; *Matter of Michael G.,* 129 Misc 2d 186).

The Court of Appeals has approved the admission of expert testimony concerning "repression" or "blockage", a psychological phenomenon whereby the victim of a violent crime was initially unable to name her assailant although he was known to her *(see, People v Fisher,* 53 NY2d 907). The courts have also accepted testimony on such other psychological phenomena as "battered woman's syndrome" *(see, People v Ciervo,* 123 AD2d 393; *People v Emick,* 103 AD2d 643; *People v Torres,* 128 Misc 2d 129); "battered child syndrome" *(People v Henson,* 33 NY2d 63); "piquerism" (which is the "realization of sexual satisfaction from penetrating a victim by sniper activity or by stab or bite wounds") *(People v Drake,* 129 AD2d 963, 965), and the stress suffered by Laotian refugees in attempting to assimilate into American culture *(People v Aphaylath,* 68 NY2d 945).

Our holding is also consistent with the decisions of the courts in other jurisdictions where evidence of rape trauma syndrome has been held to be admissible *(see, e.g., State v Radjenovich,* 138 Ariz 270, 674 P2d 333; *State v Huey,* 145 Ariz 59, 699 P2d 1290; *State v Marks,* 231 Kan 645, 647 P2d 1292; *State v McQuillen,* 239 Kan 590, 721 P2d 740; *State v Liddell,* 211 Mont 180, 685 P2d 918; *State v Whitman,* 16 Ohio App 3d 246, 475 NE2d 486; *see also,* Annotation, *Admissibility, at Criminal Prosecution, of Expert Testimony on Rape Trauma Syndrome,* 42 ALR4th 879; McCord, *The Admissibility of Expert Testimony Regarding Rape Trauma Syndrome in Rape Prosecutions,* 26 B C L Rev 1143 [1985]).

In *People v Hampton* (746 P2d 947 [Colo]), Colorado's highest court held that expert testimony concerning rape trauma syndrome was admissible in a rape case in which the victim was an adult to explain why a rape victim who is assaulted by someone that she knows rather than by a stranger is generally more reluctant to report the assault to police because of fear of retaliation. In *Hampton,* the defendant had based his defense partially on the victim's three-month delay in reporting the assault.

Since the issue of whether such expert opinion testimony should be admitted is a matter in the first instance for the trial court's discretion, and since there is ample evidence to

support the conclusion that the jury had a use for this type of evidence because the typical reactions of the victims of sex crimes are normally beyond the scope of the average juror's knowledge, it is readily apparent that this evidence was properly admitted.

## II

■ We find no error in the court's denial of the defendant's motions to recuse Justice Namm and to disqualify the Suffolk County District Attorney. A recusal motion is addressed to the discretion of the trial court *(People v Moreno,* 70 NY2d 403; *People v Smith,* 63 NY2d 41; *People v Bartolomeo,* 126 AD2d 375, 381), and " '[i]n the absence of a violation of express statutory provisions, bias or prejudice or unworthy motive on the part of a Judge, unconnected with an interest in the controversy, will not be a cause for disqualification, unless shown to affect the result' " *(People v Moreno,* 70 NY2d 403, 407, *supra,* quoting *Matter of Johnson v Hornblass,* 93 AD2d 732).

In addition, the courts should not remove a public prosecutor absent a showing of actual prejudice arising from a demonstrated conflict of interest or a substantial risk of an abuse of confidence *(People v Zimmer,* 51 NY2d 390). The defendant here failed to demonstrate actual prejudice or so substantial a risk thereof as would warrant disqualification of the District Attorney. The District Attorney's own internal investigation regarding the circumstances surrounding the destruction of the tape recording did not, standing alone, require the disqualification of the District Attorney.

■ Nor did the court err in denying the defendant's motion to dismiss the indictment based on the destruction of the tape recording. Whether the prosecution should be sanctioned because of the destruction of potential *Brady* material turns on " 'the degree of negligence or bad faith [on the part of law enforcement officials], the importance of the evidence lost, and the evidence of guilt adduced at trial' " *(People v Saddy,* 84 AD2d 175, 179, quoting from *United States v Bryant,* 439 F2d 642, 653; *see also, People v Haupt,* 71 NY2d 929; *People v Kelly,* 62 NY2d 516). Furthermore, "[i]n fashioning an 'appropriate' response to the prosecution's wrongful failure to preserve evidence (see CPL 240.70, subd 1) * * * the overriding concern must be to eliminate any prejudice to the defendant while protecting the interests of society. * * * [T]he drastic

remedy of dismissal should not be invoked where less severe measures can rectify the harm done by the loss of evidence" *(People v Kelly, supra,* at 520-521).

Under these circumstances, dismissal of the indictment was not warranted. While it is not clear whether the People were at all culpable in bringing about the destruction of the recording, the resulting prejudice was minimal. To the extent that this tape recording might have been pertinent to the defendant's defense, it was cumulative of the tape recording of the victim and Det. Burke's subsequent conversation wherein the victim continued to assert an inability to identify her assailant, as well as the victim's own admission at trial that at the time when the subject recording was made she expressed an inability to identify the perpetrator. Furthermore, the proof of defendant's guilt was overwhelming. Had the tape recording been available and turned over to the defendant, it is most unlikely that a different verdict would have resulted *(see, People v Close,* 103 AD2d 970, 971; *People v Astwood,* 113 AD2d 946).

The defendant further argues that many of the trial court's other evidentiary rulings were in error and that those rulings violated his right to a fair trial. We disagree. The court properly permitted the victim to testify that she named the defendant as her attacker since the defendant opened the door to this testimony by assailing her previous failure to identify him *(see, People v Patterson,* 88 AD2d 694, *affd* 59 NY2d 794). However, the court's further ruling that the victim's mother as well as Officer Baglivi and Det. Burke could similarly testify during their examinations as to how the victim ultimately named the defendant as her attacker was erroneous. Such testimony was hearsay, and the defendant having not yet questioned these witnesses regarding the victim's failure to name her attacker, did not open the door to this testimony *(see, People v Melendez,* 55 NY2d 445, 446; *People v Levy,* 123 AD2d 885; *People v Francis,* 123 AD2d 714; *People v Langert,* 105 AD2d 845, 846). Nevertheless, in light of the overwhelming proof of guilt, this error was harmless, as there is no significant probability that the defendant would have been acquitted had it not been for this testimony *(People v Johnson,* 57 NY2d 969).

The court's imposition of multiple surcharges, however, was improper *(see,* Penal Law § 60.35 [2]; *cf.,* Penal Law § 70.25 [2]; *People v Scott,* 124 AD2d 684, *lv denied* 69 NY2d 833).

We have reviewed the defendant's remaining contentions and find them to be without merit.

BRACKEN, J. P., BROWN and WEINSTEIN, JJ., concur.

Ordered that the judgment of the County Court, Suffolk County, rendered June 2, 1987, is modified by deleting the imposition of three $100 surcharges and substituting therefor the imposition of one $100 surcharge; as so modified, the judgment is affirmed.