■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICHARD COBB, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Queens County (Dubin, J.), rendered October 23, 1980, convicting him of attempted murder in the second degree, robbery in the first degree, and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence.

Judgment reversed, on the law and as a matter of discretion in the interest of justice, and new trial ordered. The findings of fact are affirmed.

The cumulative prejudicial effect of several prosecutorial improprieties deprived the defendant of a fair trial. In his opening statement to the jury, the prosecutor stated that "Counihan [the police detective who helped effectuate defendant's arrest] will tell you * * * the complainant says, 'That's the man who did it. That's the man'". During trial, Detective Counihan described how the defendant was arrested and was brought to the police car, whereupon the complainant, who was sitting in the police car, said "something to the effect [of], 'Why did you shoot me?' " The prosecutor's opening comments and the detective's testimony with respect to the complainant's remarks violated the rule against improper bolstering of a complainant's identification testimony (see *People v Trowbridge,* 305 NY 471; *People v Hall,* 82 AD2d 838). These errors were compounded by certain indiscretions by the prosecutor upon his cross-examination of the defendant. The prosecutor was exploring the reasons why defendant fled when he saw the complainant point at him from the back of an approaching automobile in which the complainant was seated. After the defendant testified that he did not hear the complainant say anything, the prosecutor inquired incredulously:

"Q You didn't hear him say, 'That's the guy who tried to kill me?'

"A I didn't hear him say that.

"Q You didn't hear him say that that's the guy who shot me in the head with a gun?"

These questions were improper for two reasons: (1) they had the indirect effect of bolstering the complainant's testimony identifying the defendant as his assailant; and (2) the complainant himself never testified that he made those statements.

Moreover, on summation the prosecutor commented upon the trial testimony to the effect that defendant was the only person who ran when the complainant pointed in the direction of a group of boys among whom defendant was standing. The prosecutor unfairly misstated the evidence presented at trial by asserting that the six or seven boys other than defendant did not run because "they didn't know what this was about. They stood there and said, 'Who the hell is this guy pointing at us?' " These remarks were improper because there was no testimony that any more than two or three of the boys were facing the complainant when he pointed in the direction of the group. In addition,

the prosecutor propounded facts not in evidence when he suggested that the interior lights of the taxi which the complainant was driving when he was robbed went on when the defendant opened the rear door of the cab. The complainant had actually testified that the light went on some moments later, when the defendant's accomplice opened the driver's door of the cab, just before defendant's accomplice pulled the complainant out of the cab. Since the defendant had sought to establish that the complainant did not have sufficient time or illumination to see the robber's face, the prosecutor's comments that the interior light may have been triggered by the opening of the rear door were prejudicial. Although the issue was not preserved for review, we reach it in the interest of prejudice.

We further find that certain remarks by the prosecutor, upon summation, which focused upon the defendant's record of irregular attendance at school, and implied that the poor attendance record was some indication that defendant might be a killer, exceeded the bounds of permissible rhetoric (see *People v Ashwal,* 39 NY2d 105, 109-110). In these comments, the prosecutor declared, "I submit to you, she [defendant's mother] has two sons — the son who eats supper in the house, and the son that was thrown out of John Adams High School. The son who goes nine days out of three or four months to school, and the son who puts a gun to a taxi driver's head and blows his brains off".

It was also improper for the prosecutor to fail to produce a mug shot taken of defendant at the time of his arrest. Defense counsel specifically requested this photograph during trial after Detective Counihan had testified that defendant did not have a moustache at the time of his arrest. The mug shot showed defendant as having had a conspicuous moustache on the date of his arrest. If the photograph had been produced, it might have been useful in discrediting the detective's testimony. The photograph was also relevant to the issue of defendant's identity as the perpetrator, since the complainant, in his initial description to the police of his assailant, made no mention of any moustache, and defendant sought at trial to establish that he had a thick moustache at the time the crime was committed (Feb. 25, 1980), similar to the one he wore at the time of his arrest (April 27, 1980). There is no indication in the record that the prosecutor made a diligent, good-faith effort to produce the photograph once the moustache had become an issue (see CPL 240.20, subd 1, par [d]; subd 2).

Finally, it was also improper for the prosecutor to introduce a photograph of defendant for the purpose of contradicting the testimony of a defense witness, the defendant's mother, on the

collateral matter of whether defendant ever wore bandanas or scarves on his head (see *People v Schwartzman,* 24 NY2d 241, 245, cert den 396 US 846).

The cumulative effect of these errors cannot be said to be harmless in this case where the identity of defendant as the perpetrator of the crime was hotly contested, and where the identification of the defendant rested solely upon the testimony of the complainant, and defendant took the stand and denied his participation in the robbery and the shooting. Accordingly, a new trial is required (see *People v Hall,* 82 AD2d 838, *supra*). We have considered defendant's other contentions and find them to be without merit. Bracken, J. P., Brown and Niehoff, JJ., concur.

Weinstein, J., dissents, and votes to affirm the judgment of conviction, with the following memorandum: I do not adhere to the majority's conclusion that the cumulative effect of certain prosecutorial improprieties was so prejudicial as to have deprived defendant of his right to a fair trial. Notwithstanding the fact that defendant's trial was not completely error free, appellate courts are constrained to determine appeals without regard to technical errors or defects which do not affect the substantial rights of the parties (CPL 470.05, subd 1). It is my conclusion that the concededly improper comments of the prosecutor did not so substantially prejudice this defendant's right to a fair trial as to warrant reversal (*People v Galloway,* 54 NY2d 396, 401; *People v Ashwal,* 39 NY2d 105, 111; *People v Johnson,* 101 AD2d 1030). Reversing a judgment on the ground of prosecutorial misconduct constitutes an "ill-suited remedy" inasmuch as it "does not affect the prosecutor directly, but rather imposes upon society the cost of retrying an individual who was fairly convicted" (*United States v Modica,* 663 F2d 1173, 1184, cert den 456 US 989).

Viewing the evidence in the light most favorable to the People (see *People v Kennedy,* 47 NY2d 196, 203, mot for rearg dsmd 48 NY2d 635; *People v Benzinger,* 36 NY2d 29, 32), it is clear that defendant's guilt was established beyond a reasonable doubt, defendant's appellate counsel's scathing invective against the prosecutor and the trial court notwithstanding. The record demonstrates that Naseem Ijaz, a cab driver, was robbed by a group of five males, two of whom had entered his cab and asked to be taken to a specific location before ordering him to stop and pick up three more friends. One of the friends, later identified as defendant, opened the right rear door of the cab, pulled out a gun and announced a holdup. The perpetrators then proceeded to confiscate money and property from Ijaz. At one point, the complainant attempted to run away, whereupon he heard an

explosion and fell to the pavement striking his forehead. The complainant was thereafter found by a fellow cab driver and the police who transported him to the hospital. He was hospitalized for 11 days. Under adequate illumination from his cab and a street light, Ijaz had had an ample opportunity to observe the armed robber during the course of the holdup. The man identified as defendant had stood very close to Ijaz during much of the robbery, giving orders to his friends and "acting like a gang leader". Defendant was facing Ijaz throughout most of the incident and the latter testified that he had a "very abnormal" face, the description of which "I can't forget".

Some two weeks after the crime, Ijaz saw defendant on the street and unsuccessfully attempted to follow him. Approximately a month later, Ijaz again observed defendant, who made a threatening gesture at him. The next time Ijaz spotted defendant he was standing in a group with six or seven other people. Upon noticing Ijaz, who was in a car with two detectives, defendant fled. The detectives ultimately caught defendant and placed him under arrest. Ijaz once again encountered defendant while he was out on bail pending trial. Defendant, at this time, threatened Ijaz with bodily harm if he did not drop the charges. On the basis of these encounters, Ijaz was able to identify defendant at trial without a shred of doubt as the man who had shot him.

Defendant's contention regarding prosecutorial concealment of photographs underlining discrepancies between his actual appearance and the complainant's description of him is utterly baseless. Prior to trial, there was no reason to believe that the subject photographs might be exculpatory. The moustache issue did not arise until well into the trial, when Detective Counihan stated that defendant had no facial hair at the time of his arrest. The defense counsel thereupon requested that the People supply him with a mug shot taken at the time of the arrest, presumably to show that defendant had always had a moustache. The prosecutor stated that he did not have the subject photograph and the trial proceeded.

On cross-examination of defendant's mother, the prosecutor, having apparently obtained the photograph in the interim, had it marked for identification and used it to interrogate her concerning another phase of the defendant's appearance. The photograph was introduced into evidence by the People after defendant himself admitted that it was a fair representation of his appearance at the time of his arrest. Moreover, a second photograph which allegedly depicts defendant's moustache with a greater degree of clarity than the aforesaid People's exhibit

was subsequently admitted into evidence notwithstanding the People's objection that it was taken some eight months prior to the commission of the instant crime. Thus, defendant's allegation that the prosecutor withheld and concealed photographic evidence is unsupported by the record.

The contention that the trial court permitted improper bolstering of complainant's identification testimony by the witness Counihan and the prosecutor in cross-examining defendant is likewise without legal merit. The record shows that Detective Counihan was merely providing a narrative account of the circumstances culminating in defendant's arrest. When Counihan testified that he had found defendant crouched down in the weeds behind a garage, and that he thereupon effected an arrest, he was not testifying as to complainant's previous identification of defendant. He was, rather, identifying the man who had fled and whom he had chased and arrested as defendant. Nor did the prosecutor's use of rhetorical questions in the course of cross-examining defendant, while concededly ill-advised, amount to improper bolstering. Rather than attempting to plant a false view of the evidence in the jurors' minds, the prosecutor seemed to have been questioning defendant in the manner objected to in an attempt to procure an admission that the latter's flight emanated from his having overheard inculpatory remarks made about him by Ijaz to the detectives. Whatever prejudice arose from this manner of questioning was dissipated by defendant's statement, in response to a query of the trial court, that he had not heard Ijaz say anything at the time in question.

Although it was error for the prosecutor to have introduced a photograph into evidence for the purpose of contradicting the testimony of a defense witness on the collateral matter of whether defendant ever wore bandanas on his head (see *People v Schwartzman*, 24 NY2d 241, 245, cert den 396 US 846), the verdict clearly did not hinge on this error. This is readily distinguishable from the far more prejudicial situation in which the prosecutor went so far as to express a personal conviction that a particular witness was testifying falsely (see *People v Bailey*, 58 NY2d 272). In view of the collateral nature of this matter and its virtual insignificance in terms of the verdict, said error was, at worst, harmless (*People v Crimmins*, 36 NY2d 230).

Although several of the prosecutor's comments on summation are not deserving of the accolades and would have been better left unsaid, particularly the remarks regarding defendant's flight and the intimation that the interior lights of the complainant's taxi had gone on when the rear door was opened, defendant failed to register an appropriate protest sufficient to

preserve a question of law as to most of them (CPL 470.05, subd 2; *People v Nuccie,* 57 NY2d 818; *People v Santiago,* 52 NY2d 865). It is my conclusion that this court should decline to exercise interest of justice jurisdiction inasmuch as these indiscretions, emanating as they did from the prosecutor's overzealousness, clearly did not operate to deprive defendant of his right to a fair trial (CPL 470.15, subd 6, par [a]; see *People v Hopkins,* 58 NY2d 1079, 1083; *People v Gonzalez,* 101 AD2d 1030). In view of what I perceive to be the overwhelming evidence of guilt and the absence of any substantial likelihood that the verdict hinged upon these alleged errors, the interest of justice, as I perceive that interest, warrants an affirmance of defendant's conviction.