THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PETER BARTOLOMEO, Appellant.

Second Department, March 30, 1987

376

## APPEARANCES OF COUNSEL

*Richard A. Greenberg* for appellant.

*Patrick Henry, District Attorney (Mark D. Cohen* of counsel), for respondent.

## OPINION OF THE COURT

MOLLEN, P. J.

The instant appeal arises out of the defendant's conviction, following a retrial, of felony murder in connection with the shooting death of John McLoughlin on April 15, 1978, which occurred while the defendant and an accomplice were burglarizing the decedent's home. The defendant's first felony murder conviction was reversed by the Court of Appeals in an opinion which established the rule that a suspect whom authorities knew or should have known was then represented by counsel on an unrelated charge, cannot waive his right to have an attorney present during police questioning unless the attorney is present during the waiver *(see, People v Bartolomeo,* 53 NY2d 225). On the present appeal from his second murder conviction, the defendant raises several alleged errors which he claims deprived him of a fair trial, including prosecutorial misconduct, alleged bias and prejudice of the Trial Judge and the alleged systematic exclusion of persons 18 to 20 years old from the jury pool. We have reviewed all of the defendant's arguments and find them to be without merit.

### THE FACTS

*The People's Case*

For a period of approximately one year prior to his death, the decedent, John McLoughlin, lived at 9 Otsego Avenue, Dix Hills, in Suffolk County, with his friend Eddie Foster. In December 1977 James McKendrick, a friend of Foster, visited 9 Otsego Avenue with his friend Joseph Caprisecca for the purpose of purchasing marihuana. McKendrick introduced Caprisecca to Foster and the three men smoked marihuana together. While in the house, Caprisecca noticed that the home was well furnished with valuables, including a television set and stereo system.

On January 7, 1978, Caprisecca was in a bar in Deer Park

with another friend, Richard O'Gorman, when he asked O'Gorman if he was interested in burglarizing a house in Dix Hills. O'Gorman agreed, and that night, after gaining entry to the McLoughlin-Foster home, the two men took a television set and stereo speakers. Several weeks later, Caprisecca was in the Finish Line bar located in Deer Park, where he met McKendrick. McKendrick told Caprisecca that Foster's home had been burglarized in early January but that the burglars had not found the money and guns which were kept in the house.

Sometime in March 1978 Caprisecca met the decedent at the Finish Line bar. The defendant, whom Caprisecca had known previously, asked Caprisecca if he knew anyone who was selling guns. Caprisecca indicated that he might know someone and telephoned McKendrick. McKendrick told Caprisecca that he was interested in selling a gun and that he would come over to the bar. Upon his arrival, McKendrick was introduced to the defendant, and they made arrangements to meet with McKendrick's friend, Ralph Giordano, who had the gun. Later that night, the defendant purchased the gun, which was a .22 caliber automatic, from McKendrick for $100.

On the evening of April 14, 1978, Caprisecca was at the Finish Line bar when the defendant entered the bar at approximately 10:00 P.M. The defendant was dressed in jeans, boots and a leather motorcycle jacket. During their conversation, the defendant said that he was in need of funds and wanted to know if Caprisecca knew where he could get some money. At that point, Caprisecca stated that he had previously burglarized Foster's home in Dix Hills, but was later informed that money and guns were still in the house. Both men then agreed to burglarize the house that evening. As the two men left the bar, the defendant stated that if any guns were found in the house, he would pay Caprisecca $50 for "whatever guns we found". At that point, Caprisecca observed that the defendant had a gun in the waistband of his pants. The two men then got into the defendant's car, a light green Volkswagen, and drove to Foster's home.

While they drove by Foster's home, at approximately 10:30 P.M., the defendant and Caprisecca observed several cars in the driveway and people in the house. They decided to go back to the bar and return to the house later that night. After a few drinks, the two men left the bar for a second time at about 12:00 midnight, and drove back to Foster's house in the

defendant's car. As they proceeded past the house, they observed that only one car was parked in the driveway and a few lights were on in the house. They drove to the end of the block, turned around and stopped in front of Foster's house. Caprisecca exited the car and directed the defendant to park the car at the nearby corner of Otsego Avenue and Seneca Avenue. Caprisecca went to the house and rang the doorbell a number of times. He also looked through the window of the front door and concluded that no one was at home.

Caprisecca returned to the car and instructed the defendant to move the car because it was in an area where there was too much light and too many people. The defendant made a U-turn and parked the car further down on Seneca Avenue. When the two men were exiting the vehicle, the defendant said, "Remember what I got in case there's any problem". Caprisecca responded, "There's not going to be any trouble because we're doing a burglary; nobody's home".

Unbeknownst to the defendant and Caprisecca, as they were walking towards the McLoughlin-Foster house, they were being watched by Rose Poukamissas and her brother Angelo, who lived on the corner of Otsego Avenue and Seneca Avenue. Rose Poukamissas had seen the defendant's car drive down Seneca Avenue and park. As the two men passed by their house, Rose and her brother Angelo noticed that one of the men was 3 or 4 inches taller than the other and was wearing a leather motorcycle jacket and boots.

Caprisecca and the defendant gained entry to the McLoughlin-Foster home through the unlocked front door. Caprisecca opened a closet near the front door and discovered a tape deck which he then placed on the floor near the front staircase. The defendant proceeded upstairs while Caprisecca remained on the first floor and went to the rear of the house. While he was in the den, Caprisecca heard gunshots being fired and someone yelled, "Ah, Ah". Caprisecca ran to the front of the house and as he looked up the staircase, he observed someone fall face down at the top of the stairs. Caprisecca did not see the defendant and ran out of the house through the rear sliding glass doors. As Caprisecca ran by the front of the house, the defendant darted out the front door. The two men proceeded hastily to the car, and when they ran by the corner of Otsego Avenue and Seneca Avenue, they were again observed by Rose and Angelo Poukamissas.

Once in the car, Caprisecca asked the defendant what had

happened. The defendant replied that when he broke into a room, he did not expect anybody there, but the victim came at him with a pillow and he "just blew that [guy] away". The defendant, in an effort to dispose of the gun, drove to the Babylon docks located at the end of Fire Island Avenue. The defendant exited the car, took the gun out of his boot and threw it into the water. When the defendant returned to the car, Caprisecca indicated that they should make an anonymous phone call to find out if the person in the house was still alive and needed assistance. The defendant responded, "The guy's dead and you ain't calling nobody. We're going back to the Finish Line and we'll establish an alibi there. Everybody there knows us. No one will think we left or anything".

The two men arrived back at the bar before 1:00 A.M. Caprisecca ordered a drink while the defendant began talking with Steve Manteiga. After he finished his drink, Caprisecca went home.

Meanwhile, the defendant and his friend Manteiga remained at the bar. According to Manteiga, the defendant came up to him at the bar at about 1:00 A.M. and said, in a low voice, that he had just "shot a guy". The defendant then asked Manteiga to accompany him to the men's room. Manteiga described his conversation with the defendant as follows: "Peter told me he went on a burglary with Joseph Caprisecca in Deer Park [sic], and he was upstairs and Joey was downstairs in the house. And he was upstairs checking the rooms, and one of the doors were [sic] locked and he forced open the door by kicking it open. And when he kicked it open, this guy jumped up with a pillow in his hand and he shot him. And then he told me he was worried about—Being that he shot him with a .22 automatic, he was worried about the cartridges being on the floor with his fingerprints on them. Was [sic] worried about being caught for that. And he asked me if—you know, what he should do. And then he said, 'Would you want to—Can you go back there with me and get them?' I said, 'No. What are you, nuts? I'm not going to go back there.' "[1]

Following the aforesaid conversation, the defendant asked Manteiga to accompany him outside the bar. The two men

---

1. As discussed in further detail, *infra,* during the conversation between the defendant and Manteiga, one Gerald Fromme was in the bathroom for at least part of the time. Although Fromme had testified on behalf of the prosecution at the defendant's first trial, he could not be located during the second trial, and, as a result, did not testify.

walked over to a Carvel ice cream store located next to the bar and the following occurred:

"A He repeated what he had told me in the bathroom, that him and Joseph—Joey Caprisecca, they went on a burglary in Dix Hills, and that he was upstairs and Joey was downstairs. And he was checking the doors upstairs. One of the doors was locked. He forced it open by kicking it open. A man came at him, shot—and he shot the man, and he was worried about his fingerprints being left on—on the cartridges, being that it was a .22 automatic. Then he told me that Joey was wearing gloves during the burglary and he had a handkerchief wrapped around his hand. And then—

"Q What did he say in relationship to that?

"A Can you repeat that?

"Q What did he say with respect to that handkerchief and gloves?

"A He said Joey had gloves on and he had this handkerchief wrapped around his hand. So he wiped things off with it, you know, when they left the house. But he was still worried about the cartridges being left on the floor. And then he told me he threw the gun—after the burglary, him and Joey went and he threw the gun in the bay.

"Q Did he tell you the reason that he went on this burglary?

"A He said he was looking for guns."

Meanwhile, Eddie Foster and his girlfriend Joan (to whom he was married at the time of the trial), returned home at approximately 2:00 A.M. As they pulled up to the house, they noticed that the front door was wide open and lights were on inside the house. Upon entering the house, Eddie noticed that a pillow case and his tape deck were on the floor near the staircase. Eddie and Joan walked upstairs and observed McLoughlin lying at the top of the stairs in a pool of blood. Joan immediately called the police.

While they were waiting for the police to arrive, Eddie recalled that McLoughlin had an unlicensed gun under his mattress which he had purchased after the January burglary. Foster, apparently afraid that the police would discover the unlicensed weapon, retrieved the gun from his roommate's bedroom and hid it under some leaves in the backyard.

The police arrived shortly after the call. The initial investigation determined that there was an absence of any signs of

forced entry. Several .22 caliber shell casings were also uncovered in the vicinity of the front staircase. Following interviews conducted by the police of the surrounding neighbors,[2] including the Poukamissases, the police put a radio notification out to patrol units for a late model, light colored Volkswagen driven by two males in their late teens or early twenties. One of the males was described as wearing a motorcycle jacket. The autopsy which was subsequently performed on McLoughlin's body revealed three gunshot wounds in the chest area. The time of death was estimated to be between 3 to 12 hours before he was seen by the Deputy Medical Examiner at 5:00 A.M.

Later that day at approximately 2:00 P.M., Caprisecca visited McKendrick's home and informed McKendrick that he (Caprisecca) and the defendant had robbed Foster's home the night before. Caprisecca also stated, although mistakenly, that Foster had been shot. McKendrick became upset about the robbery and feared that the gun which had been used by the defendant was the very gun McKendrick sold him several weeks previously.

The next day, April 16, 1978, Caprisecca was in the parking lot of the Finish Line bar in the late afternoon when he was approached by the defendant. The defendant showed Caprisecca several newspaper articles about the killing. The defendant noted that none of the articles mentioned that a burglary had also been committed and stated "See, they don't know nothing about it. They can't pin nothing on us. We'll just stay away from each other for a while". The defendant also emphasized, "Make sure, don't say nothing to nobody". When Caprisecca stated that he had already spoken to McKendrick about the incident, the defendant became angry and indicated that he wanted to see McKendrick to make sure that he (McKendrick) "keeps his mouth shut". Later that week, the defendant and Caprisecca met with McKendrick at the Finish Line bar. The three men got into McKendrick's car and took a ride. While driving, the defendant admitted that he acted irrationally during the burglary but that McLoughlin surprised him. The defendant told McKendrick, "Make sure you don't say

2. Joseph Lisanti, who lived at 62 Seneca Avenue, informed the police that while he was watching the Johnny Carson show on the evening in question, he looked out his window and saw a Volkswagen parked across the street facing Otsego Avenue. Anthony Plumitallo, who also resided on Seneca Avenue, heard popping sounds which sounded like fireworks at approximately 12:30 A.M. that morning.

nothing to nobody". McKendrick agreed not to say anything about what he knew because the gun he sold to the defendant was used in the shooting.

During the few weeks after the shooting death of John McLoughlin, the police conducted a surveillance of the neighborhood for cars fitting the description of the defendant's car. On or about June 3, 1978, Police Officer Sheridan informed the investigating detectives that he had seen a vehicle fitting the description of the perpetrator's vehicle at 11 Cricket Court in Deer Park. As a result of this information and that collected through other sources, the police set up surveillances at that location as well as the Finish Line bar.

On June 4, 1978, Caprisecca was arrested in the parking lot of the Finish Line bar and charged with the murder of McLoughlin. Caprisecca was then transported to the homicide squad, where he initially denied his participation in the killing. Caprisecca eventually signed a sworn written statement for the police regarding the events surrounding McLoughlin's death. This statement was later found to contain some false information.

The next day, June 5, 1978, Caprisecca agreed to show the police where the weapon used in the murder had been disposed of. Caprisecca accompanied the detectives to the foot of the Babylon docks and directed the officers' attention to a certain area of water. Caprisecca acknowledged that he pointed out the wrong area because he was trying to protect himself. The police divers' attempts to locate the weapon were unsuccessful.

The defendant was eventually arrested at his home on June 5, 1978, and brought into custody. On June 9, 1978, the defendant, together with Caprisecca, were transported to court in a Sheriff's vehicle. While in the car, the defendant turned to Caprisecca and said that the police knew where the gun was thrown and that he (Caprisecca) must have told them where it was. Caprisecca denied giving that information to the police.

Caprisecca was eventually arraigned on June 12, 1978. On June 13, 1978, Caprisecca, after consultation with his attorney, informed the police that he would cooperate and give them the correct location of the discarded weapon. Several days later, Caprisecca returned to the docks with the homicide detectives and showed them the exact area where the gun had been thrown. The .22 caliber gun was eventually recovered by police divers.

While the defendant was in the Suffolk County Jail in June 1978, he came into contact with another inmate, Michael Walsh. During one of their first conversations, the defendant asked Walsh if he knew why the defendant was in jail. When Walsh responded in the negative, the defendant showed him a newspaper article about the McLoughlin shooting. The defendant pointed to the article and said, "You see this? I did this, and that son-of-a-bitch—that son-of-a-bitch [Caprisecca] is the only one that can testify against me". Thereafter, in a subsequent conversation, the defendant told Walsh that he wanted Caprisecca roughed up and agreed to pay Walsh $25 if he would do the job. Although Walsh informed the defendant that the job was carried out, in fact, Walsh never located Caprisecca. The defendant also offered Walsh $25,000 if he would arrange to have Caprisecca "knocked off".

In July 1978, Walsh contacted the District Attorney's office and informed them of his conversation with the defendant. As a result of his cooperation with the authorities, Walsh received a favorable plea bargain in connection with the charges pending against him.

*The Defendant's Case*

The defendant essentially sought to establish an alibi defense at trial. Robert Marino, a bouncer at the Finish Line bar, testified that he was working on the evening of April 14, 1978, and observed the defendant enter the bar at about 10:00 P.M. Marino saw the defendant at least three times during the evening although he was not certain whether the defendant left the bar at any time during that evening. Marino also did not recall whether the defendant was wearing a motorcycle jacket. Finally, the witness stated that he did not see Caprisecca at the bar that night. Bob Bennett testified that he went to the Finish Line bar between 12:25 and 12:30 A.M. on April 15, 1978, and observed the defendant's motorcycle outside the bar. Bennett also saw the defendant inside the bar.

Madeline Tramparulo testified that the defendant was a friend of her 10-year-old son and that he arrived at her home to watch television with her son on the evening of April 14, 1978, between 8:30 and 9:00 P.M. The defendant left Tramparulo's home at about 10:30 P.M. Finally, Albert Suarez, an asphalt contractor testified that the defendant had worked for him during 1978. Particularly, the defendant was at work on Friday, April 14, 1978, and he was paid at the end of the day. The defendant also reported to work the following day at 7:00 A.M. and worked until 4:30 P.M.

## The Verdict and Sentence

The defendant was convicted of the crime of murder in the second degree in violation of Penal Law § 125.25 (3). The defendant was subsequently sentenced on February 23, 1982, to 20 years to life imprisonment.

### ANALYSIS

## Alleged Prosecutorial Misconduct

The defendant maintains that he was deprived of a fair trial as a result of various instances of alleged prosecutorial misconduct throughout the trial proceedings. The defendant's first claim of impropriety by the prosecutor involves the absence at his retrial of Gerald Fromme who had testified at the first trial against the defendant. At the first trial, Fromme had testified that he was in the men's room at the Finish Line bar during the early morning hours of April 15, 1978, and overheard the defendant's conversation with Manteiga concerning the shooting. During the conversation, the defendant told Manteiga that he shot someone 4 or 5 times and wondered whether it was possible to take fingerprints off the bullet shells. Fromme turned to the defendant and said, "How could you, like, use an automatic gun and let the bullets fall on the floor with your fingerprints on them? It's like leaving your name there". Fromme also stated that the defendant should not try to return to the scene and retrieve the bullet casings. Fromme then left the men's room. Later that night, Fromme saw the defendant again in the bar and the defendant asked what he should do with Caprisecca who assisted him in the burglary. Fromme responded: "If I was in this predicament and I was with somebody, and I wasn't sure about the guy, I would blow him away; tie up any loose knots there might be".

At the second trial, the prosecutor included Fromme's name in the list of potential prosecution witnesses. In anticipation of Fromme's testimony, the defense counsel in his opening statement stated: "And you're going to learn about Mr. Manteiga and about Mr. Fromme, another one of these people who Peter Bartolomeo allegedly made these admissions to on the night this happened. And I can tell you, as you sit there right now, that the defense is going to show you you wouldn't trust Mr. Fromme with fifteen cents to go get a cup of coffee for you much less to convict a fellow citizen of the most serious crime that can be charged in the State of New York".

Sometime prior to the time Fromme was scheduled to

testify, the prosecution was unable to locate him. During the People's case, the prosecutor informed the court of his unsuccessful efforts to locate Fromme and stated that the witness was not under his control. At the prosecutor's request the court issued a material witness warrant in an effort to secure Fromme's presence in court. Efforts to execute the warrant were also unsuccessful and the People's case closed without Fromme's testimony. No request was made by either side to have Fromme's testimony at the first trial read to the jury.

Before turning to the merits of the defendant's claim, it is significant to note that during Manteiga's direct testimony no mention was ever made about Fromme's presence in the men's room during the defendant's conversation with Manteiga about the homicide. However, during his cross-examination of Manteiga, the defense counsel elicited the following information:

"Q And while you were having that conversation in the bathroom, did anybody else come in?

"A Yes.

"Q Who?

"A Gerry Fromme.

"Q You know Gerry Fromme?

"A I know him from the bar, yes.

"Q And you knew him in 1978, correct?

"A Yes.

"Q Mr. Bartolomeo keep telling you about this shooting and about the cartridges while Mr. Fromme was present in the bathroom?

"A Yes, he did."

This testimony was elicited after the People disclosed the fact that Fromme could not be located. On Manteiga's redirect examination, the following colloquy occurred:

"Q Okay. You testified on cross-examination somebody came into the room, is that right?

"A Yes, I did.

"Q Was that person in there for the entire conversation you had had or a portion of the conversation?

"A *Just a small portion of the conversation.*

"Q Okay. And was there any particular reason why you and Bartolomeo left that bathroom?

"A We wanted—He wanted to speak to me, you know, alone outside without anybody else coming in.

"Q And when you spoke outside, was that alone?

"A Yes, it was, just me and Peter" (emphasis supplied).

During his remarks to the jury in his summation, the defense counsel also commented, more than once, on Fromme's absence at the trial. In particular, during his discussion of the defendant's alleged men's room confession to Manteiga, the defense counsel challenged the reliability of Manteiga's testimony, and inquired "Where is Gerry Fromme? Remember the witness list? Remember you were told, at the beginning of the trial, who was going to appear? You were told Gerry Fromme was going to be here". The prosecutor in his summation responded as follows:

"And while they're having this discussion in the bathroom, a Mr. Fromme walks in. Because they're having a private conversation, they then leave and go out and speak outside in front of the Carvel to continue this conversation. The real world. They don't want to discuss this in front of somebody else.

"[Defense Counsel]: Respectfully, Your Honor, the testimony was that the conversation continued in Mr. Fromme's presence.

"THE COURT: Well, it's the jury's recollection, not mine, not yours or [the prosecutor's].

"[Defense Counsel]: When I believe the evidence is misstated, Your Honor, I have to object, respectfully.

"THE COURT: All right. It's up to the jury to determine this, [defense counsel].

"[Defense Counsel]: It certainly is.

"[The Prosecutor]: I ask you to recall the testimony, Ladies and Gentlemen. Recall the testimony. If you don't believe me, have it read back to you.

"It's my recollection that Manteiga testified Fromme came in that men's * * * room and then he left. He may have heard a little conversation, but the reason he and Bartolomeo left the men's room was to get away from Fromme. They went out, then, to the Carvel. And they continued the conversation. His best friend was laying this heavy burden on him. He shot and killed somebody. Stephen Manteiga listened."

At the conclusion of the prosecutor's summation, the defense counsel moved for a mistrial on the basis, *inter alia,* of the prosecutor's alleged misrepresentation of the facts surrounding the defendant's statement to Manteiga. The defense

counsel stated: "[F]or the prosecutor to suggest now, on this summation, that Mr. Fromme was not present or didn't hear anything of significance, that they walked away to have a private conversation, I think was improper, especially on the basis of his knowledge that that is not the case". The court denied the motion.

On appeal, the defendant argues that the prosecutor knowingly and falsely misled the jury to believe that Fromme heard little or nothing of the defendant's men's room conversation and thus could not corroborate Manteiga's testimony. Contrary to the defendant's assertion, we do not find the prosecutor's summation remarks concerning Fromme constituted intentionally false and misleading comments which would warrant the reversal of the defendant's conviction (cf., *Miller v Pate*, 386 US 1; *People v Whalen*, 59 NY2d 273; *People v Myles Corp.*, 53 AD2d 873). The prosecutor's comments were fairly derived from Manteiga's testimony on cross-examination and redirect examination to the effect that Fromme came into the men's room while the defendant was speaking and overheard a portion of the conversation. Additionally, the prosecutor was apparently seeking to respond, albeit perhaps overzealously, to the defense counsel's comments in which the defense counsel attempted to create the impression that Fromme was not called as a prosecution witness because he would have contradicted Manteiga's testimony. The defense counsel made those statements despite the fact that he knew that Fromme had corroborated Manteiga's testimony at the prior trial and was well aware of the prosecution's unsuccessful attempts to locate Fromme during this trial. Moreover, any prejudice which may have occurred as a result of the prosecutor's remarks was dissipated by the trial court's instructions to the jury that the comments of counsel in their summations were not to be considered as evidence.

The defendant's second claim of prosecutorial misconduct involves the prosecutor's reference to the hearsay rule during his summation. These remarks arose out of the fact that Steve Manteiga testified that when he left the Finish Line bar with his girlfriend, Debbie, during the early morning hours of April 15, 1978, he told her about the defendant's admissions of guilt. Manteiga's girlfriend was not called to testify by the prosecution. In an effort to highlight the absence of any evidence to corroborate Manteiga's testimony, the defense counsel made mention of the absence of Manteiga's girlfriend in his summation. In response thereto, the prosecutor remarked:

"The comment was made by counsel that he didn't hear Debbie come in and say what Steve Manteiga told her that night, how Steve Manteiga told her that Bartolomeo admitted to her *[sic]* that he killed him. You see, in law, we have something that's known as hearsay, and it's not admissible to bring somebody else's—testimony as to what somebody else said.

"[Defense Counsel]: I object to the argument at this point. That's clearly an admission. It would have been relevant. It would have been admissible.

"[The Prosecutor]: It's clearly hearsay, Your Honor. What Manteiga had to say to his wife from—about Bartolomeo.

"THE COURT: Yes. If that had been sought to be admitted, it would be hearsay.

"[Defense Counsel]: I object to that, Your Honor.

"THE COURT: All right."

■ The courts have consistently frowned upon summation remarks which intimate to the jury that vital evidence was being withheld from its consideration because of the rules of evidence *(see, People v Jackson,* 7 NY2d 142; *People v Carter,* 52 AD2d 829, 830; *People v Davis,* 51 AD2d 974; *People v Wilson,* 40 AD2d 839, 840). However, the remarks in the case at bar, which were inappropriate, and as the People concede, would have been better left unsaid, do not require reversal of the judgment of conviction in view of the overwhelming proof of guilt against the defendant *(cf., People v Wilson, supra),* and the fact that Debbie's testimony would not have constituted "vital" evidence in the case, and would have been inadmissible *(cf., People v Davis, supra),* despite defense counsel's intimation to the contrary.

■ We also fail to find reversible error in the prosecution's summation remark urging the jury to "do their duty". The prosecutor did not, as the defendant seems to suggest, direct the jurors to do their duty to convict. Rather, the jurors were urged to follow their oath and render a verdict based on the evidence. Thus, the case at bar is clearly distinguishable from those relied upon by the defendant *(see, People v McMillan,* 66 AD2d 830 [the prosecutor invited the jury "to convict *not* on the basis of guilt beyond a reasonable doubt, but because they, as citizens, must do their duty and place 'large scale dealers', whose money supports other crimes, in jail"]; *People v Streeter,* 67 AD2d 877 [among numerous other instances of misconduct, the prosecutor, in his summation, admonished the jury that

" 'To fail to convict this defendant * * * would be under the facts failure to enforce the law' "]).

We have reviewed the defendant's remaining challenges to the propriety of the prosecutor's summation, including his display of the murder weapon to the jury, and the prosecutor's reference to the "real world", and determine that they do not warrant reversal. It is axiomatic that in summing up to the jury, counsel must stay within " 'the four corners of the evidence' " and avoid irrelevant and inflammatory comments which have a tendency to prejudice the jury against the accused *(see, People v Ashwal,* 39 NY2d 105, 109-110). In passing on the propriety of the prosecutor's remarks, the challenged comments must be viewed in total context against the background of the defense counsel's statement *(see, People v Marks,* 6 NY2d 67, *cert denied* 362 US 912). Both of the lengthy summations given in this case sought to invoke the jury's emotions and sympathy. In fact, when the defense counsel objected to the prosecutor's display of the murder weapon, the trial court commented, "Well, I see it to be no different from what appeared to me to be tears and emotion at the end of your summation, sir".[3] Additionally, on more than one occasion, the defense counsel characterized the prosecution's witnesses as liars and perjurers. Viewed in this context, the prosecutor's summation remarks were merely responsive to those of defense counsel. In any event, the jury was thoroughly instructed that their recollection of the evidence, rather than the recollection of counsel, that was to control *(see, People v Harris,* 84 AD2d 63, 103, *affd* 57 NY2d 335, *cert denied* 460 US 1047).

## Alleged Bias and Prejudice of the Trial Judge

The defendant also contends that he was deprived of a fair trial by reason of the Trial Judge's bias and prejudice against him, which the defendant asserts was manifested by the court's erroneous rulings throughout the trial. The defendant attributes the Trial Judge's alleged bias to the fact that he

---

**3.** Defense counsel's summation ended as follows: "I picked you folks to resist that kind of thinking. Every one of you has children. All but two have sons. I'm not asking for sympathy. I'm just asking that you do something— that you not do something that you wouldn't find unfair with your neighbor's son or your friend's son. You know darn well that in this case guilt hasn't been proven beyond a reasonable doubt. That is the only issue * * * I'm finished, now. He is a young man. I told you at the beginning, these are the most important days of his life. I just want you to think about that when you go in that jury room".

had presided over the defendant's first trial. Prior to the commencement of the second trial, the defendant had unsuccessfully moved to recuse the Trial Judge on the basis, *inter alia,* that his erroneous rulings and biased demeanor at the first trial indicated that he would not act impartially at the retrial. It is significant to note that on his appeal to this court from the judgment of conviction rendered after the first trial, the defendant raised the issue of the Trial Judge's prejudice and his argument was found to be without merit *(see, People v Bartolomeo,* 77 AD2d 819). In his subsequent appeal to the Court of Appeals, the defendant did not pursue that issue *(see, People v Bartolomeo,* 53 NY2d 225, *supra).* In denying to the defendant's recusal motion prior to the retrial, Justice Stark stated, "I harbor no bias, prejudice or hostility against the defendant".

Judiciary Law § 14 governing the disqualification of Judges by reason of interest or consanguinity provides in part that: "A judge shall not sit as such in, or take any part in the decision of, an action, claim, matter, motion or proceeding to which he is a party, or in which he has been attorney or counsel, or in which he is interested, or if he is related by consanguinity or affinity to any party to the controversy within the sixth degree".

This court's rules also provide: "A judge before whom a case is moved for trial shall preside at such trial unless he is satisfied, upon challenge or *sua sponte,* that he is unable to serve with complete impartiality, in fact or appearance, with regard to the matter at issue or the parties involved" (22 NYCRR 700.5 [c]). The question of whether a Judge should recuse himself to avoid an appearance of impropriety is a matter left to the personal conscience of the court *(see, People v Patrick,* 183 NY 52, 54; *Poli v Gara,* 117 AD2d 786, 789; *Casterella v Casterella,* 65 AD2d 614, 615). "In the absence of a violation of express statutory provisions, bias or prejudice or unworthy motive on the part of a Judge, unconnected with an interest in the controversy, will not be a cause for disqualification, unless shown to affect the result" *(Matter of Johnson v Hornblass,* 93 AD2d 732, 733).

In the case at bar, the Trial Judge did not abuse his discretion in denying the defendant's motion for his recusal since he determined that he harbored no bias or prejudice against the defendant. Moreover, the trial transcript does not reflect any instance in which the Trial Judge exhibited any prejudice or bias. On this point, the defendant's contention

that the Trial Judge's animosity was displayed by (1) his decision to read back the complete trial testimony of Police Officer Sheridan in response to the jury's request concerning a certain portion of that testimony, and (2) his refusal to give a missing witness charge, is without merit.

In the first instance, it is well established that a trial court must respond meaningfully to the jury's request for further instructions or information *(see, People v Malloy,* 55 NY2d 296, 302, *cert denied* 459 US 847; *People v Duncan,* 46 NY2d 74, 79, *cert denied* 442 US 910)*. The adequacy of the trial court's response is gauged by the form of the jury's question, the particular issue of which inquiry is made, the supplemental instruction actually given and the presence or absence of prejudice to the defendant *(see, People v Almodovar,* 62 NY2d 126, 131-132; *People v Malloy, supra,* at 302). Judged by these standards, no abuse of discretion occurred as a result of the court's decision to have Police Officer Sheridan's entire trial testimony read back to the jury rather than the certain portion requested. The officer's testimony was rather brief, consisting of only nine transcript pages. Moreover, the court's action was apparently prompted by its concern that the jury not be confused over the various dates involved.

With respect to the court's failure to give a missing witness charge, it is essential to note that prior to the counsels' summations and again following the summations, both sides were given an opportunity to submit written requests to charge. At neither time did the defense counsel request a missing witness charge with regard to Gerry Fromme. In his supplemental request to charge, the prosecutor had requested, *inter alia,* that the jury be charged that no unfavorable inference may be drawn from the fact that Fromme was not called as a witness. The defense counsel opposed the application and only at that point requested that a missing witness charge be given. The Trial Judge denied the People's application and, in response to the defense counsel's cross application, stated that a missing witness charge would only be given if the defendant consented to the reopening of the case to allow the prosecutor an opportunity to explain the absence of the witness to the jury. The defense counsel refused to consent to allowing the prosecutor to reopen his case.

The three conditions which must be met in order for a trial court to give a missing witness charge are, (1) there must be a pending issue upon which the missing witness could be expected to give relevant and material information; (2) the

uncalled witness must be knowledgeable on the pending issue; and (3) the witness must be one who is found to be in the control of and available to the party failing to call the witness *(see, People v Almodovar, supra,* at 132-133; *People v Rodriguez,* 38 NY2d 95; *People v Oakley,* 28 NY2d 309; 1 CJI [NY] 8.53, at 443-447). At bar, the third prong of the aforesaid test was not met since there is no indication whatsoever in the record to support a conclusion that the prosecution had control over this witness *(see, People v Gonzalez,* 68 NY2d 424). Moreover, a party who has failed to call a witness should be given an opportunity during trial to explain his failure to call the witness *(see,* 1 CJI [NY] 8.53, at 447). In view of the defense counsel's refusal in this case to consent to the reopening of the prosecution case to enable the prosecutor to present evidence to the jury why Gerry Fromme had not been called to testify, the court did not err in refusing to give a missing witness charge.

*Underrepresentation of Individuals from 18 to 20 Years Old in the Jury Pool*

The defendant, who was 19 years old at the time of his arrest, challenged the panel of prospective jurors prior to trial, pursuant to CPL 270.10, on the ground, *inter alia,* that persons 18 to 20 years of age were systematically underrepresented and excluded. In his motion papers, the defendant pointed out that out of the 1,039 prospective jurors, there were no 18 or 19 year olds and only 17 were 20 years old. A hearing was held on the defendant's application and the defendant called Albert Cavagnaro, the Suffolk County Commissioner of Jurors, as his witness. Cavagnaro testified that the primary source of prospective jurors is derived from a mailing list which is comprised from, *inter alia,* voter registration lists, high school graduation lists, motor vehicle registration lists and telephone directories. Due to the then recent amendment in the age eligibility law which qualified persons 18 to 20 years of age for jury service (L 1977, ch 316, § 2), Cavagnaro's office made a concerted effort to communicate with the high schools located within Suffolk County in an attempt to obtain the names of prospective jurors within this age group. As a result of these efforts, approximately 2,521 persons within the 18- to 20-year-old age group were added to the master jury pool as of October 1981. The parties stipulated that the 1980 population in Suffolk County was 1,284,231 of which 24,319 or 1.9% were 18 years old, 23,124 or 1.8% were 19 years old and 21,493 or 1.7% were 20 years old.

At the conclusion of the hearing, the trial court denied the defendant's application stating, *inter alia,* "I find there is no unfair or systematic exclusion of 18, 19 and 20 year old persons. To the contrary, I find the Commissioner of Jurors' efforts to qualify more persons in this age group has been increasingly successful".

■ In order to establish a prima facie violation by the State of its failure to guarantee that juries represent a cross section of the community, the defendant must show (1) that the group alleged to have been excluded is a distinctive group in the community; (2) that the representation of this group in the pool from which jurors are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this representation was the result of a systematic exclusion of the group in the jury selection process *(see, Duren v Missouri,* 439 US 357, 364; *People v Guzman,* 60 NY2d 403, *cert denied* 466 US 951; *People v Waters,* 123 Misc 2d 1057, 1065, *affd* 125 AD2d 615). In recent decisions, this court, dealing with similar challenges to the composition of the jury panel, concluded that the age group of young 18- to 20-year-old black adults did not constitute a distinctive group in the community *(see, People v Greene,* 125 AD2d 697; *People v Waters, supra; see also, People v Chesler,* 91 Misc 2d 551, *revd on other grounds* 71 AD2d 792; *People v Rosado,* 89 Misc 2d 61, *revd on other grounds* 64 AD2d 172; *People v Attica Bros.,* 79 Misc 2d 492). Thus, the defendant's challenge to the composition of the jury pool must fail on this ground. Additionally, we find that the defendant failed to adduce sufficient proof to establish that the process utilized in selecting prospective jurors systematically excluded this particular age group from the pool. In fact, the proof indicated that specific efforts were made to obtain the names of potential jurors within this age group and add them to the master jury pool. Thus, it is clear that the low percentage of youths in the 19- to 20-year-old age group was not attributable to systematic exclusion *(see, People v Guzman, supra,* at 411).

*Grand Jury Proceedings*

One of the defendant's final challenges raised on appeal involves the testimony of two witnesses who testified before the Grand Jury. The witnesses, Jimmy McKendrick and Ralph Giordano, were allegedly involved in the sale of the murder weapon to the defendant. Prior to their Grand Jury testimony, the prosecutor apparently promised both men immunity from prosecution relating to the possession and sale of

the gun in exchange for their cooperation and testimony. The witnesses had executed written waivers of immunity in front of the Grand Jury; however, the Grand Jury was never specifically informed by the prosecution of the agreement made with these witnesses. The facts surrounding the Grand Jury proceedings were brought to light during the cross-examination of these witnesses. Following their trial testimony, the defendant moved to dismiss the indictment against him on the ground that the prosecutor withheld important information from the Grand Jury. The court denied the defendant's motion.

In *People v Holmes* (118 AD2d 869), this court held that a prosecutor did not act improperly in failing to inform the Grand Jury of a prior inconsistent statement made by a Grand Jury witness. Unless a prosecutor withholds evidence which would materially influence the Grand Jury investigation, the proceedings will not be invalidated *(see, People v Thompson,* 108 AD2d 942; *People v Rockwell,* 97 AD2d 853).

It is significant that this same issue was raised by the defendant in his appeal from a conviction arising out of a May 1978 burglary committed by the defendant and Caprisecca. Caprisecca had executed a waiver of immunity when he testified before the Grand Jury; however, it was never revealed that he had been promised immunity from prosecution for those crimes. The defendant was subsequently indicted for arson and burglary and was ultimately convicted of burglary. On his appeal to this court, the defendant raised this identical issue claiming that the Grand Jury proceedings were invalid. His argument was found to be without merit *(see, People v Bartolomeo,* 79 AD2d 892) and leave to appeal to the Court of Appeals was denied *(see, People v Bartolomeo,* 52 NY2d 901). The defendant then instituted a habeas corpus proceeding in the United States District Court of the Eastern District of New York. After an evidentiary hearing, the United States District Court denied the writ, having found that the prosecutor had not willfully or intentionally misled the Grand Jury *(Bartolomeo v Smith,* US Dist Ct, ED NY, Nov. 10, 1981, Pratt, J.). The United States Court of Appeals for the Second Circuit affirmed, stating, *inter alia:* "Bartolomeo was convicted in state court, after a bench trial, of burglary in the first degree. He contends that the indictment against him was

procured in violation of his right to due process, because in presenting the case against him to the grand jury the prosecutor led the jury to believe that a witness, one Caprisecca, had not been promised leniency when in fact leniency had been promised. After an evidentiary hearing on the petition, the district court found that the prosecutor had not willfully or intentionally kept from the grand jury evidence of any promises of immunity made to the witness. This finding is not clearly erroneous, and petitioner thus has not shown the willful misconduct necessary to prove a violation of his constitutional right. *See United States v. Ciambrone,* 601 F.2d 616, 623-25 (2d Cir. 1979); *United States v. Basurto,* 497 F.2d 781, 784-87 (9th Cir. 1974). Further, we note that at Bartolomeo's trial in state court, the court was informed of the prosecutor's promises to Caprisecca and therefore explicitly viewed his testimony 'with great suspicion.' The trial court nevertheless found the remaining evidence sufficient to establish Bartolomeo's guilt on the burglary charge beyond a reasonable doubt. Given the strength of the remaining evidence, the grand jury surely would have found probable cause, even disregarding Caprisecca's testimony, to indict petitioner. Thus any error in the proceedings before the grand jury was harmless" *(Bartolomeo v Skully,* US Ct of Appeals, 2d Cir, May 18, 1982).

■ The same analysis applies to the case at bar. The fact that the Grand Jury was not informed of the promises of immunity made to McKendrick and Giordano does not affect the validity of the proceedings since such evidence merely related to the witnesses' credibility *(see, People v Holmes, supra).* Moreover, this evidence was brought before the petit jury during the defendant's trial. Thus, in view of these facts, and the strength of the People's case before the Grand Jury, the dismissal of the indictment is not warranted.

CONCLUSION

Contrary to the defendant's position, the evidence of guilt which consisted, *inter alia,* of the testimony of his accomplice, Joseph Caprisecca, the testimony of Steve Manteiga in which he recounted the defendant's repeated admissions of the murder, the eyewitness testimony of Foster's neighbors who corroborated the presence of the defendant and Caprisecca at the scene of the crime, and the retrieval of the .22 caliber gun off the Babylon docks, was clearly overwhelming. Furthermore, the defendant's other arguments are without merit. Accord-

ingly, the defendant's judgment of conviction should be affirmed.

LAWRENCE, WEINSTEIN and KUNZEMAN, JJ., concur.

Ordered that the judgment is affirmed.