THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v AKIM WEBSTER, Appellant. [5 NYS3d 492]—

Appeal by the defendant from a judgment of the Supreme Court, Richmond County (Rooney, J.), rendered May 16, 2011, convicting him of murder in the second degree and attempted murder in the second degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is affirmed.

The defendant was accused, and ultimately convicted, of murder in the second degree and attempted murder in the second degree, arising from a shooting incident that occurred after 11:50 p.m. on November 15, 2009. The defendant, while allegedly a passenger in a Ford Fusion automobile rented by his girlfriend, pulled up alongside a white Lexus automobile operated by Dante McKie. Kamik Sears was sitting in the front passenger seat of McKie's vehicle, while Andre Scott was

seated in the rear of the same vehicle. An occupant of the Ford Fusion fired shots into the white Lexus, killing Sears and injuring McKie. Although McKie initially denied seeing the shooter, at approximately 6:00 a.m. on the morning after the shooting, he identified the defendant as the shooter after being shown a photo array. At the same time, McKie told the police that Kyree Henderson, a person known to McKie who was of interest to the police, was not present when the shooting occurred.

Two days later, Henderson was found dead, in possession of a weapon that was ballistically matched to the shootings of Sears and McKie. Testing performed on the weapon revealed the presence of DNA from several sources, most of which was contributed by Henderson, but which also included lesser amounts of genetic material from others whose identities could not be determined.

McKie testified at trial and identified the defendant, whom he had known since childhood, as the shooter. A stipulation was read to the jury regarding the results of the DNA testing on the gun. Other evidence against the defendant included the ballistic match of the recovered gun to the bullets recovered from the crime scene and the bodies of the victims, documentation with respect to the rental of the Ford Fusion by the defendant's girlfriend, and records of calls made to and from the defendant's girlfriend's cell phone.

During summation, defense counsel argued that Henderson's DNA was recovered from various parts of the gun that was used in the shooting, thereby suggesting that there was at least a reasonable doubt as to whether the defendant was the shooter. Thereafter, in summation, the prosecutor addressed the presence, on the gun, of DNA from unidentifiable sources and stated, "What I would argue to you is that it's the murderer's DNA, the defendant's DNA. There is nothing contrary to that, number one. And number two, we have evidence that proves to you that he was firing into the vehicle and handling it." No objection was interposed by defense counsel to that assertion.

The defendant argues on appeal that the judgment of conviction should be reversed on the ground that the prosecutor improperly asserted, during summation, that the defendant's DNA was actually found on the murder weapon. We reject that contention. First, any contention regarding this aspect of the prosecutor's summation is unpreserved for appellate review (see CPL 470.05; People v Barcero, 116 AD3d 1060 [2014]). In any event, the prosecutor's remark about DNA was responsive to defense counsel's earlier summation argument suggesting

that Henderson was the shooter. The prosecutor drew an inference from the evidence, linking McKie's testimony identifying the defendant as the shooter with the scientific evidence that DNA other than Henderson's was found on the weapon used in the crime (*see People v McHarris*, 297 AD2d 824, 825 [2002]). The jury could evaluate the inference that the prosecutor suggested that it draw for what it was worth. Moreover, the jury was instructed that it was to resolve issues of fact based solely on the evidence, and that the attorney's arguments were not evidence (*see People v Valdes*, 291 AD2d 513, 514 [2002]; *People v Turner*, 141 AD2d 878, 880 [1988]). We disagree with our learned dissenting colleague that the prosecutor propounded facts not in evidence, as the remark was prefaced by the phrase, "I would argue that," which falls short of any misrepresentation to the jury about the DNA test results or the parties' stipulation about those results. Indeed, at no time did the prosecutor ever state to the jury that any scientific testing definitively identified the defendant's DNA upon the weapon. Under the circumstances of this case, the prosecutor's summation comment with respect to DNA evidence was not improper, and there is no merit to the defendant's contention that cumulative errors warrant a new trial.

The defendant's girlfriend, who was an alibi witness, testified on cross-examination that, over the course of the entire night on which Sears was murdered, she may have been sending text messages from her cell phone to the defendant's cell phone while both she and the defendant were inside of her two-bedroom apartment. She further testified that, over the course of the entire night that Henderson was murdered, she had numerous conversations on her cell phone. Records from the cell phone company that provided service to the defendant's girlfriend revealed that, on the night of the Sears murder, and into the next morning, the defendant and his girlfriend were engaged in numerous telephone conversations on their cell phones, and not sending and receiving text messages, thus undercutting the girlfriend's testimony that the defendant was with her in her apartment over that period of time. Additional records from the same provider indicated that the calls made from and received by the girlfriend's cell phone on the night of the Henderson murder did not involve the defendant's cell phone. During summation, the prosecutor, in reference to the girlfriend's testimony, rhetorically asked: "Coincidence? Or was something else going on with [the defendant's girlfriend] and her phone on the two nights of two separate and distinct murders?" Contrary to the defendant's contention, that portion of the prosecutor's summation did not improperly suggest that

the defendant was guilty of the Henderson murder, which was not at issue during the trial (*see People v Ashwal*, 39 NY2d 105, 110 [1976]). Instead, under the particular facts of this case, we find no reason to reject the People's argument that the remark merely undermined the credibility of the defendant's girlfriend as an alibi witness by pointing out to the jury that, contrary to her testimony, the telephone calls between the defendant and her on the night of the Sears murder suggested that the defendant was not at her apartment, and that the telephone calls to and from her cell phone on the night of the Henderson murder may have implicated her as an accessory to that crime (*see People v Galloway*, 54 NY2d 396, 399 [1981]; *People v Ashwal*, 39 NY2d at 109; *People v Mobley*, 116 AD3d 1067 [2014]).

Viewing the evidence in the light most favorable to the prosecution (*see People v Contes*, 60 NY2d 620 [1983]), we find that it was legally sufficient to establish the defendant's guilt of the crimes charged beyond a reasonable doubt. Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (*see* CPL 470.15 [5]; *People v Danielson*, 9 NY3d 342 [2007]), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (*see People v Mateo*, 2 NY3d 383, 410 [2004]; *People v Bleakley*, 69 NY2d 490, 495 [1987]). Upon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence (*see People v Romero*, 7 NY3d 633 [2006]).

Contrary to the defendant's contention, the People properly elicited testimony from his girlfriend during cross-examination regarding her delay in coming forward to the authorities with certain exculpatory information. Before a defense witness may be cross-examined regarding his or her failure to come forward with exculpatory information at an earlier date, certain foundational requirements must first be met (*see People v Dawson*, 50 NY2d 311, 321 n 4 [1980]). Here, the prosecutor laid the necessary foundation prior to cross-examining the defendant's girlfriend about her apparent delay in informing law enforcement authorities of the defendant's alibi. The record indicates that, during a bench conference, it was ascertained that the defendant's girlfriend had not refrained from speaking to authorities under the advice of defense counsel. Moreover, the court instructed the jury that the defendant's girlfriend had no obligation to volunteer exculpatory information to law enforcement authorities. Under these circumstances, the People properly elicited evidence during the cross-examination

of the defendant's girlfriend that she delayed in contacting the authorities with exculpatory evidence (*see People v Dawson*, 50 NY2d at 322-323).

The defendant's contention that the verdict was repugnant is unpreserved for appellate review, as he failed to raise this issue before the discharge of the jury (*see People v Alfaro*, 66 NY2d 985, 987 [1985]; *People v Ariza*, 77 AD3d 844 [2010]). In any event, the defendant's contention is without merit (*see People v Francois*, 85 AD3d 813 [2011]; *People v Gross*, 71 AD3d 1526 [2010]; *People v Stitt*, 201 AD2d 593 [1994]; *see generally People v Tucker*, 55 NY2d 1 [1981]).

The defendant's remaining contention is not properly before this Court. Dillon, J.P., Balkin and Barros, JJ., concur.

Cohen, J., dissents and votes to reverse the judgment, on the law and as a matter of discretion in the interest of justice, and to order a new trial, with the following memorandum: While my colleagues in the majority conclude that the prosecutor's summation remarks constituted fair comment on the evidence, were responsive to arguments and theories presented in defense counsel's summation, or were permissible rhetorical comment, I disagree.

On November 15, 2009, in Staten Island, Dante McKie was driving a white Lexus, in which Kamik Sears was riding in the front passenger seat and Andre Scott was riding in the back seat. Another vehicle pulled up along the driver's side of the Lexus and shots were fired, injuring McKie and killing Sears. McKie then drove to his home at 44 Yale Street, Staten Island, leaving Sears in the car. When the police arrived, they found Sears's body in the car, and thereafter had McKie transported to a nearby hospital. Scott spoke with the investigating detective, Girolamo Campione, at 44 Yale Street, and told him that he did not see the shooter, explaining that, just as he saw the gun, he ducked down into the car and then heard the shots. When Detective Campione initially interviewed McKie in the hospital at approximately 2:20 a.m. on November 16, 2009, a "coherent" McKie told him that he did not see the shooter, and did not see the car from which the shots were fired. During these early morning hours, a warrant was obtained to search McKie's apartment at 44 Yale Street, from which drugs were recovered. At approximately 3:00 a.m., another detective received a tip from an unknown confidential informant identifying both the defendant and Kyree Henderson as individuals of interest in connection with the shooting.

Detective Campione thereafter prepared two photo arrays, one including a photograph of the defendant, and one including

a photograph of Henderson. At approximately 6:00 a.m. on November 16, 2009, Detective Campione returned to the hospital, after recovering the drugs from McKie's apartment, to see if McKie could identify the shooter, even though McKie had previously stated that he did not see the shooter. Detective Campione testified at trial that McKie then was able to identify the defendant from one of the arrays as "the one that did the shooting," and that McKie, while recognizing Henderson, told Detective Campione that Henderson "wasn't there."

Two days after the shooting, the murder weapon was recovered from Henderson's dead body, and DNA was recovered from the weapon. The major portion of the genetic material in the DNA samples that were recovered belonged to Henderson, and there were other sources of lesser amounts of DNA that could not be identified or determined. During the trial, the prosecutor and defense counsel stipulated to the fact that DNA samples containing a mixture of DNA sources were found on the murder weapon, but that only the DNA of Henderson—the major contributor to the DNA—could be identified.

In summing up to the jury, a prosecutor "must stay within the four corners of the evidence and avoid irrelevant and inflammatory comments which have a tendency to prejudice the jury against the accused" (*People v Spann*, 82 AD3d 1013, 1015 [2011] [internal quotation marks omitted], quoting *People v Bartolomeo*, 126 AD2d 375, 390 [1987]; see *People v Ashwal*, 39 NY2d 105, 109 [1976]). Thus, a prosecutor "may not refer to matters not in evidence or call upon the jury to draw conclusions which are not fairly inferrable from the evidence" (*People v Ashwal*, 39 NY2d at 109-110 [citations omitted]).

In the instant matter, the prosecutor, despite the stipulation described above, and without any foundation to support her argument, stated as follows during her summation:

"What about DNA? DNA on the gun? Stipulation it actually went to the lab, it's recovered from several locations on the gun. The back strap, the trigger, the magazine, all different locations, some of which is Kyree Henderson's and some of which cannot be determined. Which means that someone else's DNA is on the gun, but the DNA lab is unable to determine whose it is.

"What I would argue to you is that it's the murderer's DNA, the defendant's DNA. There is nothing contrary to that, number one. And number two, we have evidence that proves to you that he was firing into the vehicle and handling it. Yet Kyree Henderson was obviously the last person that touched it."

Thus, the prosecutor propounded facts not in evidence when she suggested that the defendant's DNA was found on the murder weapon, when forensic experts made no such finding.

Further, the prosecutor, again without any foundation to support her contention, strongly implied that the defendant, in addition to committing the crimes charged in connection with the instant matter, may have also been responsible for the subsequent death of Henderson. There was simply no evidence to connect the defendant to this uncharged crime (*see People v Riback*, 13 NY3d 416 [2009]).

To the extent that the defendant's claims of prosecutorial misconduct and overreach are unpreserved for appellate review, they should nevertheless be reviewed in the exercise of our interest of justice jurisdiction (*see* CPL 470.15 [6] [a]; *People v Spann*, 82 AD3d at 1015; *People v Cobb*, 104 AD2d 656, 658 [1984]).

In my view, the comments made by the prosecutor during summation were so inflammatory and prejudicial as to deprive the defendant of a fair trial (*see People v Ashwal*, 39 NY2d 105 [1976]; *People v Spann*, 82 AD3d 1013 [2011]; *People v Brown*, 256 AD2d 414 [1998]; *People v Cobb*, 104 AD2d at 658; *see also People v Mehmood*, 112 AD3d 850 [2013]).

The cumulative effect of these errors cannot be said to be harmless in this case, where the identification of the defendant rested solely upon the testimony of McKie, who, when first interviewed, stated that he neither saw the shooter nor the car from which the shots were fired. It was only after McKie was visited by Detective Campione, and after drugs were recovered from McKie's apartment on the night of the shooting—for which, notably, McKie was neither arrested nor prosecuted—that McKie was able to identify the defendant as the perpetrator of the crimes charged in this matter. Accordingly, since the evidence of the defendant's guilt was not overwhelming, the errors cannot be deemed harmless (*see People v Crimmins*, 36 NY2d 230, 241-242 [1975]).

Nor did the trial court's jury charge eliminate the prejudicial effect of any prosecutorial misconduct (*see generally People v Riback*, 13 NY3d 416 [2009]). A trial court's instruction to a jury to disregard matters improperly brought to their attention cannot "always assure elimination of the harm already occasioned" (*People v Calabria*, 94 NY2d 519, 523 [2000], quoting *People v Carborano*, 301 NY 39, 42-43 [1950]).

Accordingly, I respectfully dissent, and would reverse the judgment and order a new trial.